## JULIAN PETROLEUM CORPORATION et al. v. EGGER. (No. 12067.)*

Court of Civil Appeals of Texas. Fort Worth. Dec. 22, 1928.

Rehearing Granted in Part. Jan. 19, 1929.

Rehearing Denied Feb. 2, 1929.

*Writ of error refused.

Webster Atwell, of Dallas, and Weeks, Morrow, Francis & Hankerson, of Wichita Falls, for appellants.

Carrigan, Britain, Morgan & King and E. R. Surles, all of Wichita Falls, for appellee.

BUCK, J. H. D. Egger filed suit against the Julian Petroleum Corporation and the California-Eastern Oil Company, the petition having two counts. The first count sought judgment against the Julian Petroleum Company, by virtue of a draft for $10,000 drawn on it by one R. T. Couch, and sought judgment against the California-Eastern Oil Company, hereinafter called California Company, on the theory that the California Company assumed all the debts and liabilities of the Julian Petroleum Company, hereinafter called the Julian Company, including the debt of the plaintiff, as evidenced by the draft, or that the California Company impliedly assumed such debt. The second count was for a decree of specific performance against the Julian Company upon an alleged contract which the plaintiff pleaded was entered into between him and one R. T. Couch, as the agent of the Julian Company, for the purchase and sale of a leasehold estate situated in Cooke county, Tex. There was no written instrument evidencing such a contract, except the draft signed by R. T. Couch, claimed to be the agent of the Julian Company, and an assignment of the oil and gas lease executed by the plaintiff to the Julian Company, and an attorney's opinion upon the title of said lease. In each of the counts plaintiff alleged that Couch was the duly authorized agent of the Julian Company, and, in the alternative, that, if he be mistaken as to this, that said Couch had apparent authority to bind the Julian Company for the purchase of said lease.

Simultaneously with the filing of this suit, the plaintiff had issued a writ of attachment against twelve leases situated in Cooke county, belonging to the California Company.

The defendant Julian Company answered by a general demurrer, and special exceptions based on the ground that its name did not appear on the draft except as drawee, and that it could not be held liable upon said draft, since it had never accepted the same in writing. Further it answered under oath that R. T. Couch was not its agent and had no authority to draw said draft, or to bind it in anywise in the purchasing of any oil and gas leasehold estate; that the said R. T. Couch had no apparent authority, and that it never held out the said R. T. Couch to the public as its duly authorized agent, and that, if it be mistaken as to the apparent authority of the said R. T. Couch, it ceased to be an operating company on or about April 23, 1927, and sold most of its properties to the California Company; that after said date it did not conduct any business, had no agents conducting any such business, and that S. C. Lewis ceased to have any authority for the transaction of any business for it. Further the Julian Company pleaded the statute of frauds as a defense to the second count for specific performance of the contract.

The California Company answered by a general demurrer, and further alleged as a defense that its name nowhere appeared on the draft, and that it did not in anywise assume or agree to pay any obligations or debts of the Julian Company after April 23, 1927, seven days prior to the date of the alleged contract which the plaintiff pleaded. It alleged that on said date it purchased most of the properties of the Julian Corporation and could not have assumed a debt which at that time was not in existence. Further, the California Company filed a cross-action against the plaintiff to have removed the cloud cast upon the title of its properties situated in Cooke county, by virtue of a writ of attachment which was sued out by plaintiff.

The cause was tried before a jury, upon the following special issues:

(1) Did R. T. Couch have actual authority from S. C. Lewis to purchase the lease in question for the Julian Petroleum Corporation from plaintiff, Egger? Answer: "Yes."

(2) Did the Julian Petroleum Corporation through its officers and agents, by their actions give to R. T. Couch the apparent authority to purchase the lease in question for the Julian Petroleum Corporation? Answer: "Yes."

(3) Did S. C. Lewis tell Becker at the time Becker presented the Egger draft, if you find he did present the same to Lewis, that he would pay the draft tomorrow? Answer: "Yes."

Before the case was given to the jury on the foregoing special issues, the defendants both moved the court to instruct a verdict in

their favor, which motions were overruled.

Upon the verdict of the jury, the court rendered judgment in favor of plaintiff against the Julian Company and the California Company for $10,000, and further foreclosed the attachment lien upon the twelve leases situated in Cooke county, the title to which was in the California Company, and ordered the same sold, to which judgment the defendants and each of them excepted.

### Opinion.

The first proposition is: "The trial court erred in entering judgment for the plaintiff because there was no finding of the jury that R. T. Couch had authority to draw the $10,000 draft in question, and there was no acceptance of said draft in writing."

In 2 Corpus Juris, p. 591, § 227, it is said: "If authorized to purchase on credit, an agent may make the necessary representations as to the solvency of the principal. But it has been held that such an agent has no implied authority to bind the principal by the execution of notes for the goods purchased, unless it is indispensable to the execution of the power."

See Edgerly v. Cover, 106 Iowa, 670, 77 N. W. 328; Perrotin v. Cucullu, 6 La. 587; Morris v. Bowen, 52 N. H. 416.

In the last-cited case, where a principal instructed an agent to purchase a lot of pelts, to be paid for in cotton goods, and failed to furnish the goods or any other means of payment, it was held that the agent might give a promissory note for the price thereof, in which it was stipulated that the pelts were to be paid for in cotton goods, on demand, and indorse his personal guaranty of payment, upon which he could make his principal liable for reimbursement if compelled to pay himself. Authority to purchase a saloon and fixtures has been held to give the agent authority to execute corporation notes in payment therefor. Manhattan Liquor Co. v. Joseph A. Magnus & Co., 43 Tex. Civ. App. 463, 94 S. W. 1117.

The jury found in response to special issue No. 1 that R. T. Couch had authority to purchase the lease in question for the Julian Company, and, the court having rendered judgment for the plaintiff on the draft, it will be presumed that the court found that Couch had authority to draw the draft in question; such issue being in accord with, supplemental and incidental to, and in support of, the issue of his authority to purchase the said lease. We think this presumption of the trial court's finding is in harmony with the holding of the Supreme Court in Ormsby v. Ratcliffe, 1 S.W.(2d) 1084, in discussing article 2190, Rev. Civ. Statutes, which in part provides:

"Failure to submit an issue shall not be deemed a ground for reversal of the judgment, unless a submission has been requested in writing by the party complaining of the judgment."

And: "An issue not submitted and not requested is deemed as found by the court in such manner as to support the judgment if there is evidence to sustain such finding."

The Supreme Court said: "We think there is no inconsistency with these different provisions of statutory law, and that the construction we are giving them is in thorough harmony and in keeping with our system of practice in regulating and controlling the trial of cases. In administering justice under our rules of procedure, it is necessary that issues be brought and presented to the jury in such a way as a clear and final finding by it may be had sufficient to a rendition of a judgment in the case. The construction contended for would put this statute entirely out of harmony with other provisions, and would not only make uncertain jury trials, but in many instances be a denial of a trial by a jury, and would open the way for surprise holdings and results not contemplated by the parties.. Independent grounds of recovery, or grounds of defense wholly neglected and ignored by the parties to the suit themselves, would be made the basis for judgment in the face of the issues submitted, and regardless of the findings by the jury, and, too, upon issues which under reason and the statutes above quoted should be held to have been waived." ·

In another portion of the opinion, the court said: "It has been held in a number of well-considered cases, and we think correctly so, that the above-quoted provision of the statute does not apply to issues in the case which are independent causes of action in themselves or controlling and independent grounds of recovery, or independent grounds of defense, but that it applies only to such omitted issues as are in accord with, and supplemental or incidental to, and which support, the issues of fact which were submitted and found by the jury, and upon which the judgment is based. It will be observed that the statute provides that such an issue not submitted and not requested is deemed 'as found by the court in such manner as to *support the judgment*,' but it does not provide that such omitted issue or finding shall in itself form the basis for the judgment as an independent ground of recovery, but only in support of the judgment properly found and based on a recoverable ground. The language used clearly implies that such unsubmitted and unrequested issues could not form an independent and original basis for the judgment, but only shall be found in such manner as to support the judgment."

We think that in the instant case the finding of the jury that Couch had authority from S. C. Lewis, the president and general manager of the Julian Company, to purchase the lease in question, was an independent ground of recovery pleaded by plaintiff, and

that the issue as to whether or not Couch had the authority to draw the draft in question was but supplemental and incidental to the finding of the jury already mentioned, and that the court would· be presumed, in support of the judgment, to have found that he had the authority to draw the draft. No issue was requested by either party as to the authority of Couch to draw the draft in question, and there is ample testimony to sustain a finding upon such issue. Couch testified that in 1927 S. C. Lewis was the president and general manager of the Julian Company, and that he (Couch) had many transactions with him in reference to the purchases of leases for the Julian Company in Cooke county. An exchange of telegrams was had between the witness and Lewis in January, 1927, ·which authorized witness to purchase leases to the extent of $15,000 in the name of the Julian Company, and to draw drafts on said corporation to pay for same. Said witness identified the list of drafts paid by the Julian Company during the period from January 20, 1927, to March 15, 1927, which showed thirteen separate drafts drawn by him in a manner similar to the Egger draft and paid by the defendant. Appellant cites a number of authorities, and 2 Corpus Juris, pp. 636, 637, in support of the contention that the power to purchase does not ordinarily include the power to pay by note for the property purchased. But we believe that this assignment has already been properly disposed of by what we have said hereinabove, and the proposition is overruled.

 The second proposition is that the trial court erred in overruling the defendants' objections to the submission of special issue No. 2, to the jury, because the court did not submit the definition of the phrase "apparent authority," in connection therewith. Inasmuch as the court submitted to the jury the issue as to whether R. T. Couch had actual authority from S. C. Lewis to purchase the lease in question for the Julian Company, we think that the second issue becomes immaterial. If he had actual authority, it is unimportant as to whether he had apparent authority or not. The court stated to the counsel for appellant, that, if they or the counsel for appellee would . submit a charge on apparent authority, he would give it. Neither submitted such charge. It is urged that under the authority of Texas Pacific Coal & Oil Co. v. Stuard (Tex. Civ. App.) 7 S.W.(2d) 878, it was the duty of the court, in the absence of the submission of a proper charge, to properly instruct the jury with reference to all legal terms used in the charges given or the issues submitted. We agree with the proposition stated, but think that it becomes immaterial on account of the answer by the jury of issue No. 1. The assignment is overruled.

 The third proposition is: "The trial court erred in entering judgment for the plaintiff because the alleged contract for the purchase of a mineral and gas lease entered into by R. T. Couch and the plaintiff was not reduced to writing and there was no sufficient memoranda to satisfy the statute of frauds."

The draft drawn by Couch as agent of the Julian Company, which agency must be conceded by virtue of the finding of the jury to issue No. 1, was equivalent to a promissory note, and no written acceptance was necessary. Article 5940, Rev. Civ. Statutes of 1925, and section 130 thereof reads as follows: "Where in a bill drawer and drawee are the same person, or where the drawee is a fictitious person, or a person not having . capacity to contract, the holder may treat the instrument, at his option, either as a bill of exchange or a promissory note."

If Couch was authorized by the president and general manager of the Julian Company to purchase the lease in question, and to draw a draft therefor on the Julian Company, then the drawer was the agent of the company, and the drawee was the company itself. If the agency be established, as it is by the finding of the jury, then we think that this section applies, and that the draft was equivalent to a promissory note. Where an agent has authority to purchase and accept an article and pay for it by a draft on his principal, his acceptance, in the absence of fraud, is binding on the principal. Woldert Co. v. Citizens' Bank of Ft. Valley, Ga. (Tex. Civ. App.) 234 S. W. 124. In Raymond v. Mann, 45 Tex. 301, it is held that a draft drawn by an agent on his principal, in the usual course of his business, is as if drawn by the principal on himself. See First National Bank v. Home Insurance Co., 16 N. M. 66, 113 P. 815; Keys Com. Co. v. Miller, 59 Okl. 42, 157 P. 1029; Clemens v. E. H. Stanton Co., 61 Wash. 419, 112 P. 494; Watauga Co. Bank v. McQueen, 130 Tenn. 382, 170 S. W. 1025.

If the draft was drawn ·by the duly authorized agent of the Julian Company, and payable· by the company, then, in effect, it was a draft drawn by the principal against itself, and, as before stated, may be treated as a promissory note of the Julian Company. In support of appellants' contention, they cite Dominion Oil Co. v. Pou (Tex. Civ. App.) 253 S. W. 317, and Pou v. Dominion Oil Co., 265 S. W. 886, the latter by the Commission of Appeals. The Court of Civil Appeals at Amarillo reversed the judgment obtained by Pou, and rendered judgment for the appellant. On appeal to the Supreme Court, that court through the Commission of Appeals, held that the statute of frauds was without application to an executed contract. As stated by counsel for appellants in their brief, the facts in that case were very similar to the facts in the instant case. The Commission of Appeals said: "There is just one question of importance in this case. It is this: Is there any substantial evidence in the case to sus-

tain the finding that the transaction between Pou and Owens was a completed one, and that the contract of assignment was executed? If there is evidence to establish a delivery and acceptance of the assignment, the judgment of the trial court should be affirmed."

The court then goes on to discuss the facts of the case, and holds that the facts show that the transaction, in so far as Pou was concerned, was conclusively shown to have been a closed one. The court said: "The delivery of the draft, properly indorsed, to the bank, with the assignment attached, without instructions, strongly indicates that the draft was thus being forwarded for collection as an ordinary check would be, and that Owens attached the assignment as a means of notifying Haskell of the transaction for which the draft was drawn. The sale did not depend upon anything to be done by Haskell, or that required his approval. He had already approved the purchase and authorized Owens to close it. It is clearly inferable that the only purpose in sending the papers to him was that the draft might be paid, and that he would have information showing for what it was drawn. The question of delivery of a deed is one of intention on the part of the grantor, to be determined as a question of fact from all the facts and circumstances, and we think there was sufficient evidence to authorize the finding by the trial court that there was a delivery and acceptance of the assignment of the lease. Henry et al. v. Phillips, 105 Tex. 459, 151 S. W. 533; Taylor v. Sanford, 108 Tex. 340, 193 S. W. 661, 5 A. L. R. 1660; Empire Gas & Fuel Co. v. Allen (C. C. A.) 294 F. 617."

The Commission of Appeals, approved by the Supreme Court, reversed the judgment of the Court of Civil Appeals and affirmed the judgment of the trial court.

We therefore conclude that the assignment under consideration should be overruled. See Crutchfield v. Donathon, 49 Tex. 691, 30 Am. Rep. 112; Watson v. Baker, 71 Tex. 739, 9 S. W. 867; Busby v. Bush, 79 Tex. 656, 15 S. W. 638; Morris v. Gaines, 82 Tex. 255, 17 S. W. 538; Spivey v. Hooks (Tex. Civ. App.) 216 S. W. 486.

■■ Proposition V is as follows: "The trial court erred in admitting over the objection of the defendant, Julian Petroleum Corporation, the evidence of the witness, Becker, that S. C. Lewis told him 'that he would pay the draft tomorrow,' because such evidence is incompetent, misleading and prejudicial, since a draft can only be accepted in writing."

The witness Becker, at the time of the transaction in this case, was connected with the Pacific Southwest Trust & Savings Bank of Los Angeles, Cal., and had general supervision of the out of county collections, which included the handling of drafts. Both the Julian Company and the California Company had their general offices in Los Angeles, and the Julian Company did business with the bank with which Becker was connected. Becker testified that, when the draft reached his bank, he saw S. C. Lewis, the president and general manager of the Julian Company, about the payment of the draft, and that Lewis told him that it would be paid tomorrow. This evidence was offered, not for the purpose of showing that Lewis had accepted the draft in the regular way, but that he agreed, after the execution of the draft by his duly authorized agent, that the transaction (that is, the purchase of the lease and the drawing of the draft) was with his knowledge and consent. We think that the evidence was admissible for this purpose, and that the trial court did not err in submitting the issue of fact to the jury.

■ Proposition VI complains of the court entering judgment against the defendant, the California Company, since there was no finding of the jury, and no issue requested by the plaintiff to be submitted to the jury, that said defendant assumed the alleged debt which the plaintiff claimed the defendant, the Julian Company, owed him, and since the undisputed evidence showed that the California Company purchased certain properties of the Julian Company on April 23, or 25, 1927, and the alleged contract between the plaintiff and R. T. Couch was not consummated until April 30, 1927.

We are of the opinion that the evidence justified the trial court in assuming that the date of the purchase of the major portion of the Julian Company's assets by the California Company was after the date of the execution of the draft, and after it reached Los Angeles and was presented to S. C. Lewis. W. J. O'Conner, assistant secretary of the Julian Company and the California Company, testified: "It is a fact that the shareholders of the Julian were to obtain shares in the California-Eastern in exchange for their holdings of the Julian. The Julian did own stock in the California-Eastern. The exchange of stock was Lewis' method of undertaking to divide the assets of the Julian among its shareholders."

He further testified as follows: "The stock of the Julian was taken off of the stock exchange of Los Angeles on May 6th. Probably the reason why the stock of the Julian remained on the exchange after April 23 and up to May 6th is that the California-Eastern was not ready to place its stock in the hands of the public and until such time as arrangements had been made to definitely retire the Julian stock there could be no particular object in withdrawing it from the market. There may have been other motives on the part of Judge Lewis in regard to continuing the stock, but I could not say, as I do not know. Lewis continued to be the active head of the Julian until its properties were delivered to the California-Eastern."

T. P. Conroy, secretary of the Julian Company, testified that all of the property of the Julian Company was transferred to the California Company, except one well in Los Terricos, and a lease on a refinery at Hynes, both in California, and that in exchange for same the Julian Company obtained for its shareholders the controlling block of stock in the company. He also testified that the stock in the Julian Company was not taken off the stock market in Los Angeles until May 6, 1927. He further testified as follows:

"After the general assignment of April 23rd, transferring to the California-Eastern substantially all of the assets of the Julian Corporation, oil production, refining and distribution business and the purchase of land was taken by and in the name of the California-Eastern Oil Company. All of the business formerly done by the Julian Petroleum Corporation was carried on by the California-Eastern Oil Company with the exception of the business instance of the one well in Los Terricos district and the Julian maintained two or three watchmen at the small refinery at Hynes.

"Q. In other words, the California-Eastern had practically absorbed Julian Petroleum Corporation? A. Yes.

"Q. Took all of the property of any value? A. Yes, sir.

"Q. Assumed all of the debts and obligations of the Julian Petroleum? A. The assignment had a certain paragraph covering that. I do not remember the exact wording."

S. C. Lewis, president and general manager of the Julian Company and president of the California Company up until May 10th, testified, as follows:

"Q. Is there a Julian Petroleum Corporation now? A. Yes.

"Q. It was consolidated with the California-Eastern Oil Company? A. Legally it was not a consolidation. No, sir.

"Q. How does it happen that it was not? A. The legal consolidation was never completed. Certain properties were sold to the California-Eastern in consideration of so much of the capital stock of the California-Eastern Company.

"Q. Was that in pursuance of those letters written February 26, 1927, from your company to the California-Eastern, answered on the same date? A. That deal was modified. The terms were substantially the basis on which the deal was carried out to the point where it is to-day. California-Eastern Oil Company assumed all of the debts of the Julian Petroleum—certain of its indebtedness —took the property subject to certain other indebtedness. The Texas leases to the California-Eastern unless that has been done since I left here."

Rudolph Becker testified that Lewis was in the office of the Julian Company on the 3d and 4th of May and he presented the draft to him for collection, as he had the following instructions in the matter: "The instructions of my superiors were not to accept any instructions from anyone connected with the Julian Corporation except Mr. Lewis, and to the best of my recollection I communicated with Mr. Lewis in some way regarding this draft."

On April 27th and 28th Lewis talked to Couch over the telephone about purchasing leases and wired him in reference thereto. On May 6th, plaintiff wired the Julian Company in reference to this draft as follows:

"Julian Petroleum Corporation, Pacific Southwest Bank Building, Los Angeles, Calif. Lindsay National Bank Gainesville reports item ten thousand dollars covering blocks seventy and seventy one Muenster townsite purchased by your Mr. Couch unpaid assuming item would be taken up immediately have already obligated myself this money, Won't you kindly honor draft immediately Answer

"H. D. Egger."

No reply was received, and on May 11, 1927, he sent another telegram to the Julian Company. On the same day he received from L. J. King, president of the California Company, the following reply, addressed to him at Wichita Falls:

"Sorry your embarrassment Mr. Couch no authority to make purchases draw drafts or represent company in any way drafts will not be honored."

On May 12, 1927, H. S. Sankey, land and lease superintendent for both defendants, sent the plaintiff the following telegram:

"Los Angeles, Calif., May 12, 1927. R. T. Couch, Gainesville, Texas. Owing to the fact that Mr. Lewis has resigned and that the California-Eastern is now functioning under a new Board of Directors it will be necessary to return all leases that are now in the Bank here also we do not care to take any more leases in this territory at the present time."

█ S. C. Lewis and T. P. Conroy testified by oral deposition that the contract between the California Company and the Julian Company provided for the acceptance of debts of the latter. The deposition of W. J. O'Conner was taken by defendants. He was requested to attach to his depositions copies of all of the written evidence, minutes of the meetings, etc., between the Julian Company and the California Company that related to the deal between them. He failed to attach a copy of any of these proceedings so that they could be seen by the court and jury. We think the evidence justifies the conclusion evidently reached by the trial court that the California Company expressly assumed the debts of the Julian Company, and the date of such assumption was subsequent to the issuance of the draft in question, and its presentation to Lewis in Los Angeles. If the conclusion is correct that the date of the transfer of the major portion of the Julian

Company's assets was after S. C. Lewis had been advised by Becker of the issuance of the draft in question, or that it was to take effect at a later date, then it would follow as a matter of law that any of the assets, such as the leases in Cooke county, upon which the court foreclosed the attachment lien, would be subject to the debts of the Julian Company.

No issue was submitted to the jury or request made by either appellants or appellee for the submission of such issue upon the question as to whether the California Company assumed the contract or claim of Egger, or was liable to Egger by reason of the draft drawn, which draft was drawn five days subsequent to the date, when, according to the testimony of some of defendant's witnesses, the contract of purchase or merger was executed. The evidence is undisputed that the California Company assumed the debts and obligations owing by the Julian Company, but the real controversy was as to whether such assumption was of date April 25th or at a later date, and after at least S. C. Lewis knew that the purchase of Egger's lease had been made and that a draft in payment thereof had been drawn by Couch. While perhaps the testimony is sufficient to sustain a finding by the jury that the merger and consequent assumption of the Julian Company's debts was made, or at least became operative, after the Egger lease had been purchased and the draft in payment thereof drawn, and after the draft had reached the bank in Los Angeles and had been presented to Lewis, and he had stated that it would be paid "to-morrow," yet such a finding would not be upon undisputed testimony. In fact, such a conclusion would have to depend upon circumstantial evidence. Since the liability of the California Company for the Egger claim depends in part at least on whether the Egger claim was in existence, and therefore assumed by the California Company, at a date prior to the contract of the purchase or merger, we do not think that the trial court had the right to decide this issue, dependent upon at least conflicting testimony. This issue was a vital and independent issue in so far as the California Company's liability was concerned, and, under the authority of Ormsby v. Ratcliffe, supra, we cannot affirm the judgment on the assumption that the trial court found such issue in support of the judgment. Therefore, we conclude that, by reason of the failure of the trial court to submit such issue to the jury, and in the absence of a finding favorable thereon having been rendered by the jury, the judgment below as to the liability, at least, of the California Company, must be reversed.

We have considered the question as to whether or not the judgment as to the Julian Company should be affirmed or also reversed and remanded, but have finally concluded that

it would be better practice to reverse the judgment as to both parties defendant.

The judgment is reversed, and the cause is remanded.

On Motion for Rehearing.

Upon further consideration, we have concluded that appellee is entitled to an affirmance of that part of the judgment below which gives a recovery in favor of plaintiff against the Julian Petroleum Corporation. See Martin v. Hawkins, by this court, 238 S. W. 991, writ of error refused; Employers' Indemnity Corporation et al. v. Southwest National Bank, 299 S. W. 676, by the El Paso Court of Civil Appeals. While a writ of error seems to have been granted in the last-cited case, we do not know upon what grounds, and we think that the first case cited, together with a large number of other cases, holding that, where the liability is several, a judgment may be affirmed as to one of the parties defendant and reversed and remanded as to the others, is well established by the authorities.

Therefore the judgment heretofore rendered, in so far as it reversed and remanded the cause as to the controversy between the appellee and appellant Julian Petroleum Corporation, is vacated, and the judgment below as to these two parties is affirmed. The judgment of this court in other respects is left undisturbed, and the motion for rehearing by appellants is overruled.