**NEWTON et al. v. GARDNER.**

No. 2763.

Court of Civil Appeals of Texas. Eastland.
Dec. 2, 1949.

Rehearing Denied Jan. 6, 1950.

Johnson, Bohannon & Prescott, Dallas, George B. Darden, Conroe, for appellants.

Wilkinson & Griffin, Brownwood, Y. W. Holmes, Comanche, for appellee.

GRISSOM, Chief Justice.

Paul Gardner sued W. F. Newton and J. K. Hughes Oil Company, Inc. Gardner alleged that Newton was engaged in the business of drilling and prospecting for oil; that Gardner and Newton entered into a joint undertaking to acquire oil and gas leases in Brown, Comanche and Eastland Counties; that it was orally agreed that Newton was to pay for the leases and Gardner's expenses in acquiring them; that Gardner was to devote his time and effort to locating and acquiring desirable leases; that the leases were to be jointly owned, with Gardner's interest being a 1/32nd overriding royalty. Gardner alleged that pursuant to that agreement he acquired oil and gas leases in the name of Newton. He alleged, as to the leases in controversy, that in August, 1948, in continuance of said joint undertaking, Gardner acquired leases owned by the Central Texas Gas Company and E. E. Kirkpatrick in Brown County; that during the negotiations for the leases a trade was made between Newton and Hughes Oil Company whereby Hughes Oil Company became a part owner of said leases; that Gardner caused the purchase of said property in the name of Newton and Hughes Oil Company and that Hughes Oil Company knew of his agreement with Newton and of his right to a 1/32nd overriding royalty in said leases when Hughes Oil Company purchased their interest. Gardner further alleged that Newton and the Hughes Oil Company were denying that he had any interest in said leases. He sought judgment declaring his ownership of a 1/32nd overriding royalty in said leases and for recovery of such interest out of the production from the leases since they were transferred to Newton and Hughes Oil Company.

Defendants excepted to Gardner's petition, among other things, because such contract "being an oral one for the acquisition and obtaining an interest in oil royalty in the future, which is an interest in real estate, was in violation" of the Statute of Frauds. Vernon's Ann.Civ.St. art. 3995. Said defendants denied that as to the Central Texas Gas Company and Kirkpatrick leases there was an agreement between Newton and Gardner that Gardner was to have an interest. Defendants also answered that they each owned an undivided one-half interest in said leases; that the Hughes Oil Company did not know of the alleged interest of Gardner when they acquired an interest in the leases and that Gardner was not entitled to recover any part of the interest of Hughes Oil Company.

The issues submitted to the jury, and the answers thereto are as follows:

"1. Do you find from a preponderance of the evidence that in May, 1948, Paul Gardner and W. F. Newton entered into an agreement for the acquisition of oil and gas leases in Brown and Comanche Counties, in which it was agreed between them that Newton would pay all expenses incurred by Gardner and furnish the money necessary to acquire the leases, and Gardner would give his time and effort to locating and acquiring such leases, and that such leases, when acquired, would be jointly owned, and that the interest of Gardner therein would be an undivided 1/32nd overriding royalty? Answer: Yes.

"1-A. Do you find from a preponderance of the evidence that Central Texas Gas Company and E. E. Kirkpatrick lease was acquired under such agreement, if any you have found in answer to Special Issue No. 1, between Paul Gardner and W. F. Newton. Answer: Yes.

"2. Do you find from a preponderance of the evidence that near the commencement of negotiations for the Central Texas Gas Company and E. E. Kirkpatrick lease, W. F. Newton advised Paul Gardner that if he acquired the lease that Gardner would not have an undivided 1/32nd overriding royalty interest in said lease? Answer: No.

"3. Do you find from a preponderance of the evidence that either Johnnie Kennon or L. H. Simpson, at the time J. K. Hughes

Oil Company paid its part of the consideration for the Central Texas Gas Company and E. E. Kirkpatrick lease, knew that Paul Gardner was claiming a 1/32nd overriding royalty in said lease? Answer: Yes."

The court rendered judgment that Gardner recover from Newton and Hughes Oil Company, jointly and severally, an undivided 1/32d overriding royalty in an undivided 49/64ths leasehold interest in the Central Texas Gas Company and E. E. Kirkpatrick leases assigned to Newton and Hughes Oil Company.

. Newton and Hughes Oil Company have appealed.

Appellants contend that the alleged agreement between Gardner and Newton is within the Statute of Frauds. Appellants quote the testimony of Gardner to the effect that Newton had executed written assignments to Gardner of a 1/32nd overriding royalty in all leases acquired by Gardner in the name of Newton except those in controversy and that when such assignments were executed Newton said to Gardner, relative to the leases in controversy, " * * * when we pay off we will straighten that up. At that particular time, the Central Texas Gas Company deal had not been paid off." They quote further from Gardner's testimony to the effect that Newton executed assignment of such royalty interest to Gardner in other leases " * * * since he was getting ready to start developing them," and that Newton said, relative to the leases in controversy, " * * * as soon as we pay that off, we will make your assignment on that." Gardner also testified that after Hughes Oil Company received and paid for its interest in the Central Texas Gas Company and Kirkpatrick leases he told Newton he had heard that Hughes " * * * paid it off" and Newton said, "Yes, we have paid it off," and Gardner then said, "Well, how about making my assignment on that now." Appellants contend that this and other testimony of like effect conclusively shows that under the agreement Newton was bound to convey to Gardner his interest as soon as a deal was closed. They argue that this

was done on all other leases and that Newton's failure to assign to Gardner a 1/32nd overriding royalty in the leases in controversy when the deal for them was closed brought about the filing of this suit. They conclude that Gardner's testimony conclusively shows that the agreement between Newton and Gardner was an oral contract to convey land in the future and, therefore, in contravention of the Statute of Frauds.

Since the jury has found that the contract between Newton and Gardner was that Gardner was to devote his time and efforts to locating and acquiring leases and that Newton agreed to pay for the leases and Gardner's expenses and that, when acquired, the leases were to be jointly owned, with Gardner's interest being a 1/32nd overriding royalty, we are required to look only to the evidence tending to support this finding in determining whether there is sufficient evidence to sustain it.

The evidence is sufficient to support the finding. Gardner testified, in effect, to the facts found by the jury. He also testified that Newton " * * * was merely holding in trust for me a 1/32nd override interest." He specifically denied that there was any agreement in advance that Newton would transfer an overriding royalty to him when the leases were acquired. The agreement was made in May, 1948. The fact that on September 10, 1948, Newton did transfer to Gardner such an interest in all leases so acquired, other than those in controversy, does not conclusively show that the oral agreement was for the sale or conveyance of land in the future. Gardner testified:

"Q. It was an oral agreement? A. Yes, sir.

"Q. That was to convey to you future interest in royalty on land or leases that might be acquired; is that right? A. No, that was not the agreement; it was an agreement whereby I was to find or locate the leases, buy them and he was to pay for them, and I was to share in the leases on the basis of a 1/32nd override on everything that we acquired, and he was to pay for all of it ·

"Q. In other words, Mr. Newton was to take the title to the leases on the land, and after he obtained the title, then he was to assign to you a 1/32nd override; is that right? A. No.

\* \* \* \* \* \*

"Q. Now, on all eight of those leases, it is your contention that you had an oral agreement, not in writing but oral agreement with Mr. W. F. Newton whereby that after these leases were taken in his name that he then would assign to you the 1/32nd overriding royalty interest; is that right? A. No, that is not right."

In Lanier v. Looney, Tex.Civ.App., 2 S.W.2d 347, 350, writ ref., the court said: "Parties contemplating the joint purchase or lease of land may orally agree to such an undertaking in advance of such purchases and leases, and may orally agree, for a valuable consideration passing from the one to the other, that the deeds or leases acquired shall be taken in the name of one of them, but that the interest of each in the land shall be in a named proportion. The party in whose name the deed is taken, as between himself and the other party to such transaction, holds the interest in trust for the party unnamed in the deed. Such an agreement is not an oral transfer of the title to the land, for the party in whose name the title stands took such title, not only for himself, to the extent of his agreed interest, but also as trustee for the other party to the extent of his agreed interest."

Looking only to the testimony that tends to support the verdict, as we are required to do, we think the case is clearly within the rule stated above. We sustain the answers to Issues 1, 1-A and 2. The effect of such findings is that there was an oral agreement between Gardner and Newton for the future joint acquisition of leases in the name of Newton, with the understanding that Gardner's interest was to be a 1/32nd overriding royalty. Such an oral agreement is not within the Statute of Frauds. McAlister v. Eclipse Oil Co., 128 Tex. 449, 98 S.W.2d 171, 176; Johnson v. Smith, 115 Tex. 193, 198, 280 S.W. 158, 160; 65 C.J. 253, 254; Lyons v. Texorado Oil & Gas Co., Tex.Civ.App., 91 S.W.2d 375, 380 (writ ref.); Whittenburg v. Miller, 139 Tex. 586, 164 S.W.2d 497, 502. See also Gardner v. Randell, 70 Tex. 453, 7 S.W. 781; Miller v. Roberts, 18 Tex. 16, 67 Am.Dec. 688.

Appellants' requested issue was not substantially correct. It called upon the jury to determine the legal effect of the contract. The court did not err in refusing to submit it. See Burgess v. Sylvester, 143 Tex. 25, 182 S.W.2d 358, 360 and 41 Tex.Jur. 1031, 1032.

There only remains to be considered whether there is any evidence of probative force that Hughes Oil Company knew of Gardner's interest when they bought an interest in the leases in question.

Relative to the contention of Hughes Oil Company that there was no evidence of probative force tending to show that Kennon or Simpson knew Gardner was claiming an overriding royalty in the leases in question at the time Hughes Oil Company paid for its interest, we call attention to the following evidence. Said representatives of Hughes Oil Company knew that Gardner was instrumental in making the agreement whereby Central Texas Gas Company and Kirkpatrick assigned the leases in controversy to Newton and Hughes. They knew that Gardner made the deal. Gardner testified that after these leases had been assigned to Newton and Hughes Oil Company and they had paid the cash consideration therefor, Gardner asked Newton to assign to him a 1/32nd overriding royalty. Newton contended that Gardner had no interest in these leases, but told Gardner to talk to Mr. Kennon of Hughes Oil Company and promised to "do whatever they will do." Gardner testified that he told Newton that he resented having to call Hughes Oil Company about his interest "For I had not dealt with them and I thought I was being put in the wrong place by calling somebody else about it." Gardner testified he could not find Kennon but succeeded in getting Mr. Simpson, Treasurer of Hughes Oil Company, on the telephone and told him he was calling about his "ov-

erride." That Simpson said: "I don't know, *I thought you had your interest.* He said 'we paid that deal off the other day and I did not examine the papers very closely, but *I was under the impression that you had your interest.* * * *"

This was denied by Simpson. This conversation, Gardner said, was after the deal had been closed. Gardner testified that he had a conversation with Kennon "before the deal had been paid off."

"Q. Was that conversation about your interest in the Central Texas Gas Company and E. E. Kirkpatrick deal you had negotiated? A. Well, we did not discuss particularly my interest; we were discussing some other matters and in the conversation I asked Johnie if they had paid off the Central Texas Gas Company deal, and I told him that Mrs. Johnson had repeatedly kept asking me if they had paid it off, and that I wanted to know too.

"Q. Did you—don't state what she said to you, but did you tell him why you wanted to know? A. Well, I was concerned about whether they had paid it off and I asked Johnie about it, and *I told Johnie* (Kennon) *at the time that if they were not going to pay it off that I was in position where I could take approximately five thousand dollars in cash out of it through other parties.*

"Q. Did you mean on another trade? A. Yes, sir.

"Q. If they were not going to pay it off? A. Yes, sir; other parties would take it and were wanting it.

"Q. Was there any further conversation between you and Johnie Kennon at that time? A. He said, 'I wouldn't worry about it if I were you, we will pay that off.'

"Q. When was the next time that you had any conversation with Mr. Newton, or with anybody connected with J. K. Hughes Oil Company about your 1/32nd override in this Central Texas Gas Company and E. E. Kirkpatrick property that you had negotiated for? A. Well, after I talked with Mr. Newton the first time about it, when he first passed the buck to the J. K. Hughes Oil Company, and after

I had talked with Mr. Simpson about it, the next time that I saw any of them I believe it was while they were drilling the Watkins well.

\* \* \* \* \* \*

"Q. Right here, before we get into that conversation, I would like to ask you whether or not in the telephone conversation you had with Mr. Simpson, did you tell him that you were entitled to a 1/32nd override in this Central Texas Gas Company and Kirkpatrick property? A. Yes, sir.

"Q. When you told him that you had a 1/32nd override, was that when he told you that he thought you already had you * * *

\* \* \* \* \* \*

"Q. All right; was that conversation after the deal was closed? A. Yes, sir, and paid off."

\* \* \* \* \* \*

"Q. So far as you know, and I believe you have testified, that up until this deal was finally consummated, the J. K. Hughes Oil Company had no knowledge of your claim to 1/32nd override in this Madison (Central Texas Gas Company and E. E. Kirkpatrick) lease; did you testify to that, that you had never talked to them about it? A. I would like for you to restate that question; it is kind of involved.

"Q. Is it a fact, up to the time the Madison lease deal was consummated, that you never mentioned one word to any representative of J. K. Hughes Oil Company that you were claiming or entitled to 1/32nd override in that Madison lease; did you testify to that or not? A. No; I did not exactly say yes or no so far as J. K. Hughes Oil Company was concerned; Mr. Newton invited them to come into this venture and—but *they were aware of the fact that I owned an interest.*

"Q. Now, Paul, you say they were aware of it; who told them? Did you tell them? A. I don't recall whether I told them directly or not.

"Q. Did you hear anybody else tell them directly? A. Well, it was discussed, but as far as telling them directly—*it was discussed and they were aware of the fact.*

"Q. Was it discussed in your presence with any of the J. K. Hughes Oil Company representatives were present? A. As well as I recall, it was discussed at one time while they were drilling the Watkins well, and—

"Q. Now, let me ask you—was that after the Madison lease deal was consummated? A. That's right.

"Q. It was after the deal was paid off; but I was asking you if before the deal was closed, and up to the date that it was closed, did you testify in your deposition and did you also testify on direct examination here that so far as you knew they had no direct knowledge of your claim to the 1/32nd override? A. Well, *they were put on notice that I had a 1/32nd override.*

"Q. Who put them on notice? A. Well, *they are pretty thorough,* and—

* * * * * *

"A. They were put on notice when they were checking their respective interests in the leaseholds, on leases they were buying interests in prior to paying off this Central Texas Gas Company deal—

"Q. I did not ask you that, Paul? A. Because—well, who put them on notice, I don't know, after all, but before the Central Texas Gas Company and E. E. Kirkpatrick deal was paid off, there was a letter dictated in your office from Mr. Newton to J. K. Hughes Oil Company, transferring certain title and interest, and title to J. K. Hughes Oil Company.

* * * * * *

"Q. Now then, the deal with Central Texas Gas Company and E. E. Kirkpatrick was completed on August 12th, 1948, was it? A. Completed? No, sir; it was not completed then.

"Q. I believe it was October 12th. The contract was signed on August 12, 1948, and the assignment was made on October 27, 1948; is that correct? A. The date the assignment was made, I don't know.

"Q. Now, Paul, up to that date, have you testified here on direct examination, and also in your deposition, that so far as you knew, J. K. Hughes Oil Company had no knowledge of any claim on your part for 1/32nd override in the Madison lease?

A. Not in detail; I did not discuss it in detail with Johnie Kennon in Houston about the 10th or 11th of September.

"Q. Your testimony about that was that you just asked him if it had been paid off? A. The reason that I asked him was because Johnie was aware of the fact that I had an interest in all the other leases too.

"Q. But you did not mention a 1/32nd interest in this Madison lease, did you? A. Yes, in an indirect way; I asked him if it had been paid off, and I told him at the time that—I said, 'if you are not going to pay it off, I can get a better interest from other people, by letting them sell this property' and he understood from that conversation, I am sure, that I had some interest.

"Q. But did you tell Johnie Kennon that you had a 1/32nd override or that you were entitled to it, and that you wanted him to know it? A. To be perfectly frank, I was with good oil brothers and I did not go to that extent; I know better now.

"Q. And every time you have contacted any one of J. K. Hughes Oil Company representatives about your 1/32nd override in this Madison lease, they have told you they knew nothing about it, and that you would have to see Mr. Newton? A. Excepting the time when I first called Mr. Simpson; he said that he thought I had it, and he also come to the conclusion at the same time that he would get in touch with Mr. Newton and see about it; and he said, 'After all, you are Mr. Newton's man.'

"Q. But, Paul, that was after the deal was closed, was it? A. That's right.

"Q. And they consistently told you that it was a deal between you and Newton? A. Well, no—that is true, that they told me that I was Newton's man, and they would contact him, and after all, I was; I had the agreement with him, but at the same time they were aware from the very beginning of my negotiations for the deal; they all knew that.

"Q. You base that statement on your own conclusion? A. I do not base it on any personal conclusion; I base it on facts.

"Q. State to the jury what the facts are then? A. Well, when we had drawn up the first agreement, and it had this error in it whereby W. F. Newton and J. K. Hughes Oil Company agreed to drill two wells and in the event oil or gas was found in either one, they would drill five additional wells; at that time I called, I believe it was Mr. Simpson, but it was some one in J. K. Hughes Oil Company, in Mexia—

"Q. You don't know who you talked to—you don't know positive? A. Well, yes, I am; it was Mr. Simpson.

"Q. That was after the lease deal was completed? A. No, sir.

"Q. Before? A. It was in the process of being prepared for execution.

"Q. Tell us what you told Mr. Simpson? A. Well, I told him about this error that was in that agreement for some reason; I didn't know why.

"Q. What else did you tell him? A. I don't recall now what else." (Italics ours.)

Hughes Oil Company's said representatives deny that they had any information that Gardner was claiming an interest in the Central Texas Gas Company and E. E. Kirkpatrick leases when it bought. The testimony quoted, and particularly that italicized, is depended on by Gardner as showing that Hughes Oil Company had notice of his claim when it bought an interest in said leases. The question is: Does such testimony support the jury's finding that Kennon or Simpson knew Gardner was claiming a 1/32nd overriding royalty when Hughes Oil Company paid for its interest?

■ All of the testimony tending to support Gardner's conclusion, and the jury's finding, that Hughes Oil Company knew of his interest when they purchased is (1) that Hughes Oil Company had purchased other leases in which Newton had previously assigned a 1/32nd overriding royalty to Gardner and (2) that he told Kennon that if Hughes Oil Company did not pay off he could get $5,000 more, and (3) that Mr. Kennon said, after the deal was closed, that "I was under the impression that you had your interest." Such information was more likely to have caused the representatives of Hughes Oil Company to believe Gardner was acting as a realtor than that he owned an interest in the leases. When he was asked pointedly " * * * did you tell Johnie Kennon that you had a 1/32nd override * * *" he replied that he "did not go to that extent; I know better now." Both on direct and cross examination Gardner was repeatedly invited to testify to any actual information possessed by Hughes Oil Company's representative or that he gave to said representatives showing their knowledge of his ownership. He would not testify that he ever told them of his claim before Hughes Oil Company paid for its interest. There is no testimony of probative force tending to show knowledge by Kennon or Simpson before Hughes Oil Company paid for the lease. Gardner refused to testify that he ever told any representatives of Hughes Oil Company that he had an interest. He refused to testify to any fact showing they did have such knowledge. The jury could not have been more certain than Gardner was. In the face of Gardner's refusal to testify that he ever gave Hughes Oil Company any notice of his claim before their purchase, or to any other fact sufficient to do more than raise a surmise or suspicion that Hughes Oil Company had such knowledge, we are constrained to hold that issue 3 should not have been submitted, and that the evidence is not sufficient to sustain the answer thereto. Gardner's evidence that Hughes Oil Company knew of his interest is a conclusion not justified by any fact disclosed. It was purely speculative. It raised merely a surmise or suspicion of the fact found and, in legal contemplation, was not any evidence. 41 Tex.Jur. 1042; Baylor University v. Chester Sav. Bank, Tex.Civ. App., 82 S.W.2d 738, 746, Writ Ref.; Reile v. Barry, Tex.Civ.App., 28 S.W.2d 1108, Writ Dis.; Houston Textile Mills v. Montgomery, Tex.Civ.App., 83 S.W.2d 754, 757, Writ Ref.

The judgment against Newton is affirmed. That part of the judgment awarding a recovery by Gardner against Hughes

Oil Company is reversed and the cause remanded. Childre v. Casstevens, Tex.Sup., 224 S.W.2d 461. See also Julian Petroleum Corp. v. Egger, Tex.Civ.App., 15 S.W.2d 36, 42, Writ Ref. and 3 Tex.Jur. 1154, 1159.