James T. CARR and 7615 Associates, Ltd., Appellants,

v.

Larry D. WEISS, Appellee.

No. 07–97–0406–CV

Court of Appeals of Texas, Amarillo.

Jan. 15, 1999.

Rehearing Overruled Feb. 18, 1999.

Jack McClendon, Montgomery McClendon, McClendon Law Firm, Lubbock, for appellant.

Gary Bellair, Donald M. Hunt, Carr, Hunt, Wolfe & Joy, Lubbock, for appellee.

Before BOYD, C.J., and REAVIS and JOHNSON,* JJ.

JOHN T. BOYD, Chief Justice.

From a judgment in favor of appellee Larry D. Weiss, appellants James T. Carr (Carr) and 7615 Associates (Associates), an Oklahoma Limited Partnership, bring this appeal. The judgment arises out of a suit in which Weiss sought the recovery of various damages and, in addition, to impose a constructive trust. The underlying suit was based upon an alleged oral agreement between Weiss and Carr to purchase and jointly own an apartment complex known as the Wellington Apartments (the Wellington), located on 34th Street in Lubbock. In its judgment, the trial court imposed a constructive trust upon an undivided one-half interest in the property, ordered a conveyance of that interest to Weiss, ordered an accounting to Weiss of one-half of the profits on the property, found Associates to be the alter ego of Carr, and found Associates, as Carr's alter ego, jointly and severally liable for the performance of the judgment and the payment of all sums ordered to be paid in the judgment. Weiss was also awarded the sum of $270,000 and prejudgment interest for lost profits, $25,000 and prejudgment interest for past mental pain and suffering, and $250,000 in exemplary damages together with post-judgment interest. The judgment also recited that appellants were estopped to assert the statutes of fraud and limitations. For reasons hereinafter stated, we reform the judgment of the trial court, and as reformed, affirm the judgment.

In mounting their challenge, appellants raise eleven points of error. In the first three of those points, they argue the trial court erred in refusing to grant their motion for summary judgment or their motion for directed verdict because Weiss's case is barred as a matter of law 1) by limitations; 2) by the statute of frauds; and 3) by the Doctrine of Merger and the Parol Evidence Rule.

In point four, they argue the trial court erred in admitting evidence of the personal relationship between the parties and submitting jury questions and instructions which misstate the law relating to fiduciary duty and in entering judgment on such questions and instructions. In points five through eleven, they contend the trial court erred in submitting jury questions and instructions and in entering judgment related to: 5) Weiss's fraud allegations; 6) Weiss's negligent misrepresentation allegations; 7) Weiss's exemplary damage allegations; 8)

---

* The Honorable Carlton B. Dodson was a member of the submission panel and attended deliberations in this case. However, he was no longer a member of the court when this opinion was handed down. His successor, the Honorable Phil Johnson, has participated in his stead.

Weiss's damage issues; 9) Weiss's alter-ego allegations; 10) the jury's answers to jury questions 10 and 11 because such questions follow the Pattern Jury Charge related to promissory estoppel and have no relation to the statute of limitations; and 11) the jury's answer to jury question 12 because there was no evidence or insufficient evidence to support the jury's finding on the statute of limitations issue.

In response to questions submitted, the jury found:

1. There was a fiduciary relationship between Carr and Weiss in connection with the Wellington transaction.

2. Carr breached his fiduciary duties to Weiss.

3. Carr committed fraud against Weiss.

4. Carr made a negligent misrepresentation upon which Weiss justifiably relied.

5. $270,000 was the amount of lost profits to which Weiss was entitled because of his interest in the Wellington.[1]

6. $25,000 would compensate Weiss for the mental anguish suffered as a result of Carr's fraud or breach of fiduciary duty.

7. A constructive trust should be imposed upon the Wellington for Weiss's benefit.

8. Weiss was entitled to $250,000 as exemplary damages because of Carr's conduct.

9. Associates was the alter ego of Carr.

10. Weiss delayed the filing of suit because of his reliance upon Carr's representations.

11. Because of his reliance upon Carr's representations as to his interest in the property and the documentation of that interest, Weiss delayed the filing of this suit.

12. In September 1993, Weiss had knowledge of facts that would cause a reasonable person to make inquiries to determine his rights to the Wellington.

Because of the nature of the questions presented in this appeal, and to properly understand our discussion of those questions, it is necessary to recap some relevant portions of the extensive testimony of Weiss and Carr. Additional references to evidence will be made as it may become necessary to the discussion.

Weiss testified that he was born and raised in the Bronx, New York, went to college in West Virginia, where he received a B.A. with a major in physical education. He worked for awhile as an athletic director but then decided to further his education and enrolled in Texas Tech University. In attempting to pay his educational expenses, Weiss worked for a carpet cleaning business. However, he quit graduate school before completing his degree and formed Vann–Weiss Carpet Cleaning, Inc.

While on vacation in 1981, Weiss and his wife met Carr. During the course of their conversations, Weiss learned that Carr was a graduate of the University of Oklahoma with a major in accounting and finance and later worked for companies that operated in the development and management of commercial real estate ventures. The two couples became fast friends. During the course of their friendship, Weiss and Carr discussed investment opportunities that might result from the savings and loan crisis which was in existence at the time. In those conversations, Weiss discovered that Carr was "pretty knowledgeable" about those matters and that he "knew probably as much as anybody else in that field relating to real estate and investments." They became such good friends that when Weiss was having some financial difficulties and needed to buy a car for his daughter, Carr borrowed $3,500 and loaned it to Weiss for that purpose.

As a result of their conversations, and because of their friendship, the pair discussed acquiring a real estate investment. In those conversations, both personally and in long distance calls,[2] they decided to acquire a property in Lubbock because, in Weiss's words, "he can put it together and I was the one who was here to kind of keep an eye on it." According to Weiss, it was al-

---

1. The jury also made findings about the reasonable market value of Weiss's interest in the property above the remainder of the purchase price.

2. The evidence shows there were hundreds of telephone calls between the two.

ways understood that they would be equal owners in any property they acquired. As a result of their conversations, in 1985, Weiss began looking for investment opportunities and in doing so, talked to bankers, real estate operators, and brokers. From an employee of State Savings & Loan Association, Weiss learned that the organization hoped to liquidate the Wellington and informed Carr.

By 1990, Carr had gathered financial data indicating that income from the Wellington would be sufficient to service a million dollar debt, cover its operating expenses, and net its owners at least $70,000 per year. Through the use of that information, Carr obtained a financing commitment using the name of Capitol Devcor, Inc. Shortly after Weiss learned of that loan commitment from Carr, he received a letter of instruction from Carr directing him to make a purchase offer of $900,000 for the Wellington in the name of Vann–Weiss. In the letter, Carr, then employed by Merabank, who had acquired the Wellington, instructed Weiss not to mention his name because if he did so, Merabank would not approve the deal. Even though nothing was said about the necessity of a written agreement to show Carr's interest in the property if the offer was accepted, Weiss said they both understood that the property would be owned jointly. Parenthetically, in their conversations, Carr never said anything to Weiss about the necessity for him to make any down payment in order to own his half interest. That particular offer was not accepted by MeraBank.

However, for about the next year and a half, Weiss continued to explore the possibility of acquiring the Wellington with realtors and with Carr. Eventually, Carr called Weiss and told him that MeraBank had accepted an offer to sell the property for "around a million dollars." Carr never explained to Weiss about how the money would be raised to close the deal, but he did tell Weiss to attend the closing and stayed at Weiss's home in Lubbock when he came to close the purchase. According to Weiss, Carr never mentioned to him that Carr would not convey his half interest to him until Carr got back all of the money he put in the down payment on the Wellington. Although he attended the closing, Weiss averred that he "really didn't have a whole lot of knowledge of what was happening." According to Weiss, he did not learn that title was being taken in Carr's name alone until he attended the closing and examined the closing documents. When he asked Carr why that was done, he was told it was so they could "get more money out of it than what was in it."

Weiss testified that after the closing, as he and Carr returned to Weiss's home, Carr told him "we are now property owners," they "were quite excited" and to celebrate, the two couples went out to dinner. Although Weiss did aver that Carr never told him that he was not or would not be an owner of the property, he did testify that shortly after the deal was closed, Carr told Weiss that before Weiss would get any money out of the apartments, Carr wanted to get back the money he had put into it, which was agreeable to him.

Even so, not long after the closing, Weiss said he told Carr that because Carr was taking some money out of the Wellington, he wanted to get some money out himself. Carr responded to this request by telling him that they could handle it by executing a "maintenance agreement" in which it could be shown as an income tax deduction. The apartments were actually managed by the First Interstate Management Company so, even though most of the maintenance would actually be performed by others, Weiss executed a maintenance agreement with that company in the name of Vann–Weiss. The maintenance agreement provided that Weiss would be paid $1,500 per month.

During the period of time the property was being managed by the management company, Weiss received management reports from the company from which he learned that Carr received monthly distributions. When he asked Carr about these distributions, he told Weiss that he was recovering his equity (the $250,000 down payment) he had put in the property. As an example of their friendship, Weiss testified that Carr later began to have some financial difficulties because of a note that he had personally guaranteed for Capital Devcor, another of Carr's companies. According to Weiss, when

a warehouse owned by Devcor was being foreclosed on, he aided Carr by purchasing the warehouse in his name with money supplied by Carr. Although the property was worth $225,000, Carr did not ask Weiss to execute a power of attorney to allow Carr to make a resale of the property until after title was taken in Weiss's name. Carr was able to sell the warehouse, which resulted in a considerable financial benefit to Carr.

After having accommodated Carr in the foreclosure sale, Weiss decided it was time to document his ownership in the Wellington and, according to him, requested Carr to send him some documents showing his interest. Although Carr had told him he would send him something in writing showing his interest, he never received anything. In September 1993, when he never received any such writing, he wrote Carr and again asked for some documentation of his interest. Carr replied to this request by telling him, "[y]ou have to trust me; when I receive my—when we get this refinanced and I get my equity money out, then we will be 50–50 on the deal." Although he continued to make numerous telephone calls to Carr in which, he said, Carr continued to tell Weiss to trust him, Weiss never received anything in writing showing his ownership interest.

Finally, on May 17, 1995, Weiss said, he wrote Carr and asked for a detailed report about Carr's activities and withdrawals and to give him something in writing to confirm the "arrangement." Having received no reply, on June 2, 1995, he followed up the May 17 letter by another letter demanding a response. Carr only responded by offering him an opportunity to buy for a given price an interest in a limited partnership with Carr, which might later buy the Wellington if new financing could be obtained. At that time, Weiss sought legal counsel, which resulted in the filing of the suit underlying this appeal.

Carr testified as to his extensive experience in money matters. He was also examined at length about his use of limited partnerships and the fact that if he was the general partner, he would have the right to manage and, although he or the companies controlled by him would be liable on partnership debts, the limited partners would also be liable. Carr verified that by the time the Wellington deal came along, he and Weiss were best friends and they had regular contacts about family and other matters to the extent that when Weiss was unable to get financing for a car for his daughter, Carr helped obtain the necessary financing. He also agreed that he and Weiss had talked about going into business together, although, according to him, they never actually talked about how much money each of them could put in an investment or the actual mechanics of how such an investment would be handled.

At the time he was employed by MeraBank, Carr learned MeraBank was going to be taking over the assets that State Savings had possessed in Lubbock. Among those assets was the Wellington. Carr contacted Weiss and asked him "did he know anything about it." Later he, Weiss, and a real estate broker named Zan Ohnesorge met in Lubbock and discussed the Wellington. Carr admitted that what brought him to Lubbock and evoked his interest in the Wellington was his relationship with Weiss. He also admitted that in their conversations, he and Weiss had discussed a 50–50 relationship in property acquired by them. Carr also admitted that during his investment discussions with Weiss, it was assumed that he was going to make the decisions about the feasibility of any projects and arrange the financing, with Weiss being the "local owner's representative or whatever."

Carr also verified that at the time of the Wellington deal, he had more cash going out than he had coming in. Although Carr averred that, because the earlier deal to purchase the Wellington had not developed, Weiss "knew the deal was gone," i.e., the joint ownership arrangement. When he went to the closing, Carr admitted that he had never told him exactly how the closing was going to be handled, how the financing would be done or how the ownership would be. Carr's recollection was that as they walked out of the closing, Weiss inquired how he could make some money out of the deal, and that was the reason for the maintenance agreement. He continued to contend that his joint ownership deal with Weiss had end-

ed with the unsuccessful first offer to purchase in the name of Devcor, but "although I continued to work on it. But to this day it's never been—it's never been done." Carr did admit that he and Weiss had talked after the closing of the Wellington about a possible 50–50 ownership deal after the property was refinanced, but he continued to deny that they ever completed an agreement to own the property jointly. He admitted that he had a loan offer subsequent to the closing that would have refinanced the indebtedness, but he rejected it without consulting Weiss because the interest rate was too high and the rejection was in both their best interests.

Although he and Weiss had a number of discussions about opportunities, Carr said the Wellington was the first time they ever looked at anything. When he came to Lubbock to meet with Ohnesorge, he stayed with Weiss. The pair met with Ohnesorge on a Saturday morning and inspected the Wellington. At that time, he said, he and Weiss talked about being 50–50 partners. However, he continued to contend that the agreement was never consummated because the circumstances under which the deal for the Wellington was closed were different from those contemplated by the parties when they were discussing their 50–50 deal.

■ Reiterated, in their first three points, appellants complain of the trial court's failure to grant their motion for summary judgment or their motions for directed verdict because, they say, Weiss's claims are barred as a matter of law by 1) the statute of limitations, 2) the Statute of Frauds, and 3) the Doctrine of Merger and the Parol Evidence Rule. In considering those points relating to the denial of summary judgment, we note that it is the rule that where a motion for summary judgment is denied by the trial judge and the case is tried on its merits, the order denying the summary judgment is not reviewable on appeal. *See Ackermann v. Vordenbaum*, 403 S.W.2d 362, 365 (Tex.1966). Thus, the refusal of the summary judgment motions could not be reversible error and need not be further discussed.

■ In considering motions for instructed verdict, we note that Texas Rule of Civil Procedure 268 authorizes such motions as

long as they state the specific grounds upon which they are based. However, absent an incurable defect in the pleadings, an instructed verdict is only warranted when the evidence conclusively demonstrates that no other verdict could be rendered. *Bywaters v. Gannon*, 686 S.W.2d 593, 595 (Tex.1985); *I-Gotcha, Inc. v. McInnis*, 903 S.W.2d 829, 837 (Tex.App.—Fort Worth, 1995, writ denied). In determining whether a movant is entitled to a directed verdict, the evidence must be viewed in the light most favorable to the party against whom the directed verdict is sought and all contrary evidence disregarded. *See Porterfield v. Brinegar*, 719 S.W.2d 558, 559 (Tex.1986); *Reynolds v. Warthan*, 896 S.W.2d 823, 826 (Tex.App.—Tyler 1995, no writ). Thus, whether the trial court erred in refusing a directed verdict is a question of law to be determined by us after our review of the record.

■ It is appellants' first point of contention that Weiss's claims are barred by the two-year statute of limitations embodied in Civil Practices and Remedies Code section 16.003(a) (the two-year statute). That statute reads as follows:

(a) Except as provided by Sections 16.010 and 16.0045 [not applicable here], a person must bring suit for trespass for injury to the estate or to the property of another, conversion of personal property, taking or detaining the personal property of another, personal injury, forcible entry and detainer, and forcible detainer not later than two years after the day the cause of action accrues.

Tex. Civ. Prac. & Rem.Code Ann. § 16.003 (Vernon Supp.1999). It is the rule that a defendant who asserts the running of the statute of limitations as a bar to a cause of action bears the burden of showing that the suit is time barred. *Hansler v. Mainka*, 807 S.W.2d 3, 5 (Tex.App.—Corpus Christi 1991, no writ).

■ Carr took legal title to the Wellington on March 19, 1992. This suit was filed on July 12, 1995, more than two but less than four years from the date of purchase. The nature of the limitation challenge requires us to consider the original petition in some de-

tail. In that original petition, Weiss alleged that the parties had an agreement that if they were able to acquire the Wellington, "they would become equal partners and would equally share in all ownership benefits related to [the Wellington]." Weiss also alleged that although title to the property was taken in Carr's name, Carr continued to reassure him "that everything was being handled properly and that at an appropriate time in the future, after his 'equity loans' had been paid and the Project was 'refinanced', that he would arrange for formal documents to be prepared to evidence [Weiss's] interest in the property." Weiss further asserted that there was a "gross disparity" in the parties' business ability and that he "relied entirely upon [Carr] and [his] representations in entering into the transaction with [Carr] and in continuing his role without formal documentation of his interest." Weiss went on to assert that on June 12, 1995, Carr "repudiated all the representations which he had made to [Weiss] and which had induced [Weiss] to contribute his time, labor and efforts to [the Wellington] under the false belief that he was, in fact, a partner in the beneficial ownership of the property." As a result of all this, Weiss sought a declaratory judgment that he was "a beneficial owner" and that a constructive trust be imposed upon the property.

In contending that Weiss's claim is time barred, and assuming the applicable limitation period is two years, Carr points out the rule that the statute of limitations begins to run against the enforcement of a constructive trust by the beneficiary against the trustee at the inception of the trust and, to toll limitations in a constructive trust case, there must have been a fraudulent concealment of facts. *See Powers v. McDaniel*, 785 S.W.2d 915, 918 (Tex.App.—San Antonio 1990, writ denied). In the course of advancing that argument, Carr argues there has been no fraudulent concealment of such a nature as to toll limitations.

Further supporting his argument that Weiss's action is time barred by the two-year statute, Carr characterizes Weiss's original petition claim as seeking a constructive trust based upon a breach of fiduciary duty arising from an alleged partnership. He first posits that Weiss's petition did not allege the type of fraud which would justify a constructive trust. Carr also argues that it was not until September 13, 1996, more than four years after the Wellington closing on March 19, 1992, before Weiss realized that the parties had not agreed to share profits and losses, which, he says, is a necessary element in a partnership. Thus, Carr reasons, it was because of this lack that Weiss filed his September 13, 1996 amended petition in which, according to Carr, he "attempts to reinvent the wheel and speaks, not of partnership, but the alleged breach of a fiduciary relationship based upon personal and business dealings, and the breach of an oral agreement to **own** jointly, not as partners." (emphasis in original). As we understand this argument, Carr then concludes that because Weiss failed to properly allege the existence of a partnership, there could be no breach of a partnership fiduciary duty; hence, he reasons, Weiss failed to allege a recoverable cause of action within the two-year period.

We disagree with Carr's argument that Weiss's original claim was based upon an improperly alleged partnership, and because of that lack, no fiduciary duty was alleged. Viewed in its entirety, rather than attempting to allege a classic partnership, Weiss's original petition sufficiently alleged an agreement to purchase property with a resulting fiduciary relationship which, if violated, would give rise to a basis for a constructive trust.

■ Carr next argues that because a constructive trust is a remedial vehicle for the correction of a breach of fiduciary duty, it is the limitation period attached to the underlying wrongful act that is determinative of the issue of limitations. Citing to such cases as *Smith v. Chapman*, 897 S.W.2d 399, 402 (Tex.App.—Eastland 1995, no writ), its progenitors and progeny, which state that actions for breach of fiduciary relationship are subject to the two-year statute, Carr concludes that this action is of that nature, is barred by limitations, and because the underlying action is barred, he was entitled to an instructed verdict.

In considering Carr's argument, we note that none of the cases cited by Carr addressed the same question that is before us, namely, whether an agreement to jointly own real property existed, and if so, whether there was a fraudulent failure to consummate that agreement of such a nature as to justify the imposition of a constructive trust on the property. Thus, those cases are not definitive on the question of whether the two-year statute of limitations is applicable to the case before us.

In contesting Carr's contention that the two-year limitation statute is applicable, Weiss initially responds that he did not seek to recover damages for any of the types of injury within the purview of the two-year statute, but rather sought to impose a trust on the Wellington and to recover the damages resulting from a conversion of trust property. That being so, he reasons, the governing limitation statute is Texas Civil Practice and Remedies Code section 16.051 (the four-year statute). In relevant part, the statute provides that "[e]very action for which there is no express limitation period, except an action for the recovery of real property, must be brought not later than four years after the day the cause of action accrues." Tex. Civ. Prac. & Rem.Code Ann. § 16.051 (Vernon 1997).

In considering the question whether the two-year statute is applicable here, the court's decision in *Peek v. Berry,* 143 Tex. 294, 184 S.W.2d 272, (1944) is helpful. In that case, the plaintiffs had sought the imposition of a constructive trust against both real and personal property of a corporation because of money and goods allegedly misappropriated. The defendants had asserted that the action was barred by article 5529 of the Texas Revised Civil Statutes, the progenitor of the present two-year statute. In considering the question, the court commented:

> Actions such as this are not governed by the two-year statute of limitations, and the Court of Civil Appeals erred in so holding. The period of limitation applicable to suits to enforce a trust, or arising out of a breach of trust, is ordinarily governed either by the four-year statute of limitation prescribed for actions 'other than for the recovery of real estate, for which no limitation is otherwise prescribed,' or, if the suit may be regarded as one for the recovery of land, by the general statute of limitation applicable to suits for the recovery of real estate.

*Id.* at 275.

In *Landram v. Robertson,* 195 S.W.2d 170 (Tex.Civ.App.—San Antonio 1946, writ ref'd n.r.e.), the court held that a suit "for the recovery of real estate" within the purview of the statute was one in which the cause of action would support a trespass to try title suit without first requiring the aid of the court to establish equitable rights. *Id.* at 175. *See also Miles v. Martin,* 159 Tex. 336, 321 S.W.2d 62, 69 (1959); *Benham v. Benham,* 726 S.W.2d 618, 622 (Tex.App.—Amarillo 1987, writ ref'd n.r.e.); *Irwin v. Basham,* 507 S.W.2d 621, 623–24 (Tex.Civ.App.—Dallas 1974, writ ref'd n.r.e.). Thus, the suit underlying this appeal would not be one "for the recovery of real estate" within the purview of the statute.

Suffice it to say, under the authorities we have listed above, this is not a case of the nature governed by the two-year statute of limitations. Thus, even assuming *arguendo,* that Weiss's claims accrued on March 19, 1992, the date the Wellington title was transferred to Associates, the suit was filed within four years.

We next move to consider Carr's contention that he was entitled to an instructed verdict on the basis of the statute of frauds (Tex. Bus. & Com.Code § 26.01). In relevant part, that statute provides:

(a) A promise or agreement described in Subsection (b) of this section is not enforceable unless the promise or agreement, or a memorandum of it, is

(1) in writing; and

(2) signed by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him.

(b) Subsection (a) of this section applies to:

\* \* \*

(4) a contract for the sale of real estate.

Tex. Bus. & Com.Code Ann. § 26.01 (Vernon 1987).

In considering Carr's argument that he was entitled to an instructed judgment on the basis of the statute of frauds, appellants cite and rely upon the principles explicated in *Sorrells v. Coffield,* 144 Tex. 31, 187 S.W.2d 980 (1945). That reliance warrants a discussion of the case. In that case, it was alleged that Sorrels entered into an agreement with Coffined for the purchase of a 120–acre tract of land. Under the agreement, Coffined would pay for the land and after its purchase would sell enough of the mineral interests to reimburse him for the purchase price. After that time, Sorrels alleged, they were to be joint owners of the land. In discussing whether the agreement came under the bar of the Statute of Frauds, the court emphasized that "Sorrels chose to try his case on the theory that he was to become a 'joint owner' of the land **'as and when'** sufficient mineral interest was sold to reimburse Coffined, which, as Sorrels testified, might happen 'in 10 years or ten days or twenty years or 20 days.'" *Id.* at 981 (emphasis added).

In holding that such an arrangement would be subject to the Statute of Frauds, the court noted that although the rule in Texas is that constructive trusts in land may be proved by parol, such trusts must be based upon a binding agreement made in advance of the acquisition of title in the land. However, in the case before it, the court held that no such trust might be imposed because the contract between Sorrels and Coffined was not enforceable. The condition that Sorrels must first sell sufficient mineral interests to reimburse Coffined for his purchase price before he would be entitled to a conveyance of his interest might never occur. Thus, the court concluded, the contract was so indefinite as to Sorrels's obligation to perform that it lacked mutuality and was unenforceable. That being so, there was no valid underlying oral or written contract, and the Statute of Frauds would prevent the creation of a constructive trust. *Id.* at 981–82. It is also worthy of note that even under Sorrels's testimony, he would not own an interest in the property until some future date. *Id.* at 982. In this case, if Weiss's testimony was accepted by the factfinder, as it evidently

was, the agreement was that he would own an interest at the time ownership of the property was acquired.

Weiss cites *Newton v. Gardner,* 225 S.W.2d 598 (Tex.Civ.App.—Eastland 1949, writ ref'd n.r.e.) as supporting his position that *Sorrells* is not applicable here, because under his evidence, he established an enforceable contract sufficient to support a constructive trust. His reliance upon that case warrants its discussion. In *Newton,* the jury found that Gardner and Newton had entered into an oral agreement to acquire oil and gas leases. The agreement provided that Gardner was to devote his time and effort in locating and acquiring the leases, that Newton would pay for the leases as well as Gardner's expenses in acquiring them, and when acquired, the leases would be jointly owned, with Gardner receiving a ½2nd overriding royalty. *Id.* at 600. In disposing of the contention that the agreement was barred by the Statute of Frauds, the court quoted with approval the holding in *Lanier v. Looney,* 2 S.W.2d 347, 350 (Tex.Civ.App.—Dallas 1928, writ ref'd) that:

> Parties contemplating the joint purchase or lease of land may orally agree to such an undertaking in advance of such purchases and leases, and may orally agree, for valuable consideration passing from the one to the other, that the deeds or leases acquired shall be taken in the name of one of them, but that the interest of each in the land shall be in named proportion. The party in whose name the deed is taken, as between himself and the other party to such transaction, holds the interest in trust for the party unnamed in the deed. Such an agreement is not an oral transfer of the title to the land, for the party in whose name the title stands took such title, not only for himself, to the extent of his agreed interest, but also as trustee for the other party to the extent of his agreed interest.

*Newton,* 225 S.W.2d at 601 (internal quotations omitted). The *Newton* court found there was sufficient evidence to support that jury finding and held the agreement was not within the Statute of Frauds. *Id.*

Carr recognizes the rule explicated in *Looney*, *Newton*, and other cases of like ilk. He describes that rule as requiring that the parties orally agree 1) to acquire property, 2) that one party will provide some or all of the consideration for the acquisition, and 3) that the other party will take title to the property in his name alone, then the paying party's interest is held in trust by the party with title. However, he reasons, the rule is not applicable here because "there is no evidence that [Weiss] supplied any of the consideration used to acquire the property, in fact, [Weiss] specifically denied having any money in the project." He also argues that there was no evidence or allegation of an agreement between the parties that the title would be acquired solely in the name of Associates.

In advancing that argument, Carr views the consideration necessary to validate an agreement too narrowly. For example, in *Newton*, Gardner's agreement to look for, and obtain, mineral leases was a sufficient consideration to support the agreement. Likewise, here, there was testimony that Weiss would look for, seek to locate, and did locate investment opportunities such as the Wellington and that the title to the properties would belong to the parties equally. By its finding that a fiduciary relationship existed, the jury accepted that testimony. Under the teaching of *Newton*, that type of activity is sufficient consideration for a valid contract.

■ Carr also argues, as we understand his next contention, that because there was no evidence or allegation of an agreement between Carr and Weiss that title to the Wellington would be taken in the name of Associates and, because of that lack of agreement, it is subject to the same vice as was the agreement in *Sorrells*, *i.e.*, there was no actual meeting of the minds sufficient to sustain a contract. We disagree. Assuming that the jury question inquiring if Associates was the *alter ego* of Carr was properly submitted, and that the evidence supported its affirmative answer, it can be reasoned that the conveyance was in practical effect made to Carr even though the title was conveyed to Associates. Therefore, it was within the agreement of the parties and the agreement was permissible under the Statute of Frauds.

That being so, the trial court did not err in refusing an instructed verdict on that basis.

■ Carr next contends he was entitled to an instructed verdict under the Merger doctrine because of the later execution of the maintenance agreement with Vann–Weiss, which he says, was inconsistent with Weiss's continued claim of title. In contract cases, the "merger doctrine" is an analogue of the parol evidence rule. It refers to the absorption of one contract into another subsequent contract and is largely a matter of intention of the parties. It occurs when the same parties to an earlier agreement later enter into a written integrated agreement covering the same subject matter. Whether merger occurs, or whether another agreement is simply supplemental and does not contradict the earlier agreement is, as earlier indicated, determined from the parties' intent. A subsequent agreement does not supersede a prior agreement if it is not inconsistent with the prior agreement, is made for separate consideration, or is such an agreement as might naturally be made as a separate agreement by parties situated as were the parties to the written agreement. *Hubacek v. Ennis State Bank*, 159 Tex. 166, 317 S.W.2d 30, 33 (1958); *Fish v. Tandy Corp.*, 948 S.W.2d 886, 898 (Tex.App.—Fort Worth 1997, writ denied); *Boy Scouts of Am. v. Responsive Terminal Sys., Inc.*, 790 S.W.2d 738, 744 (Tex.App.—Dallas 1990, writ denied).

The maintenance agreement was entered into with Vann–Weiss Carpet Cleaning, Inc., not with Weiss individually. There is no finding that this corporation was the alter ego of Weiss. This record does not, therefore, establish the identity of the parties to the maintenance contract or the parties to the joint ownership agreement with the degree of certainty required to justify a directed verdict. Additionally, while there is some testimony that the maintenance agreement was entered into to enable Weiss to make some profit out of the deal, the evidence is not sufficient that the parties intended it to subsume any joint ownership agreement. This is particularly true in view of Weiss's testimony that he continued to be supplied

with management reports reflecting the financial activities of the Wellington.

■ The parol evidence rule, as relevant here, precludes the enforcement of inconsistent prior or contemporaneous agreements upon the execution of a valid integrated agreement with respect to a particular matter. *See Pan American Bank of Brownsville v. Nowland*, 650 S.W.2d 879, 884 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.), *overruled on other grounds, Crimmins v. Lowry*, 691 S.W.2d 582, 585 (Tex.1985). Because the parties are different and the subject matter of the maintenance agreement and the joint ownership agreement are different, under this record, there was no violation of the Merger Doctrine or Parol Evidence rule. Therefore, the trial court did not err in failing to grant an instructed verdict on that basis. For the reasons we have expressed, Carr's first three points are overruled.

■ In his fourth point, Carr contends the trial court erred in admitting evidence of the personal relationship between the parties and in "submitting Jury Questions and Instructions which misstate the law related to Fiduciary Duty, and in entering judgment on such Questions and Instructions." The gist of this argument is the trial evidence was legally, or in the alternative, factually insufficient to support the submission of jury questions because the parties' relationship was merely a personal one and was not of the type of relationship such as attorney/client, insurer/insured, doctor/patient, etc. which gives rise to fiduciary responsibilities.

In reviewing "no evidence" or legal insufficiency points, we are required to consider only the evidence and inferences tending to support the finding and disregard all evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). In reviewing a factual insufficiency challenge, we must consider all the evidence and set aside a finding only if the evidence is so weak or the evidence to the contrary so overwhelming that the finding must be set aside. *Id*. If, after applying that test, we find the evidence factually insufficient, we must detail the relevant evidence and clearly state why

the jury's finding is factually insufficient or is so against the great weight and preponderance as to be manifestly unjust; why it shocks the conscience, or clearly demonstrates bias. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986).

■ In *Crim Truck & Tractor v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591 (Tex.1992), the court instructs that some informal relationships may give rise to a fiduciary relationship. Those relationships have also been termed confidential relationships. They may arise where one person trusts in and relies upon another, whether the relation is a moral, social, domestic, or merely personal one. However, because not every relationship involving a high degree of trust and confidence rises to the status of a formal fiduciary relationship, the law recognizes the existence of confidential relationships in those cases in which influence has been acquired and abused or in which confidence has been reposed and betrayed. The existence of a confidential relationship is ordinarily a question of fact except in instances in which the issue is one of no evidence when it becomes a question of law. *Id*. at 594 (citing *MacDonald v. Follett*, 142 Tex. 616, 180 S.W.2d 334, 339 (1944); *Fitz–Gerald v. Hull*, 150 Tex. 39, 237 S.W.2d 256, 261 (1951); *Texas Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 507 (Tex.1980); *Schiller v. Elick*, 150 Tex. 363, 240 S.W.2d 997, 1000 (1951); and *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex.1962)). Although the relationship between the parties need not be formal, absent the showing of a formal fiduciary relationship, the evidence must show that the dealings between the parties continued for such a time that one party is justified in relying on the other to act in his best interest. *Stephanz v. Laird*, 846 S.W.2d 895, 902 (Tex. App.—Houston [1st Dist.] 1993, writ denied).

Without again reiterating the testimony of the two parties which we have recounted in some detail, suffice it to say that the testimony was sufficient to present a fact question as to whether the relationship between the parties, their activities, and their objectives was more than a mere personal relationship but was, rather, of a confidential nature. Carr

next contends that the trial court reversibly erred in submitting jury questions 1 and 2, "which did not properly define a fiduciary duty and by refusing to include the definition requested by the Appellants."

However, other than his evidentiary insufficiency objections, Carr's only other objection at the charge conference to the two issues was "for the reason that the instruction requested by the Defendants concerning fiduciary relationship and duties should be included in the court's instructions to the jury and its—the Court's failure to so instruct is error." Texas Rule of Civil Procedure 274 requires a specific objection pointing out the matter complained of and the ground of the objection. The purpose of the rule is to afford trial courts an opportunity to correct errors in the charge by requiring objections both to clearly designate the error and to explain the grounds for complaint. *Kirkpatrick v. Memorial Hosp. of Garland,* 862 S.W.2d 762, 769 (Tex.App.—Dallas 1993, writ denied). Objections to the charge and requests for submission of issues are not alternatively permissible methods for complaining of the charge. *Texas Employers' Ins. Assoc. v. Jones,* 393 S.W.2d 305, 306 (Tex.1965). Because a request for another charge is not a substitute for an objection, in the absence of a specific objection to the submitted question and instruction, the tender of a correct question is not sufficient to preserve error, even if a defectively worded special instruction is contained in the court's proposed charge. *Hernandez v. Montgomery Ward & Co.,* 652 S.W.2d 923, 925 (Tex. 1983), *overruled on other grounds, Acord v. General Motors Corp.,* 669 S.W.2d 111, 114 (Tex.1984). Moreover, it is the rule that if a trial court's charge fairly and fully presents all controlling questions to the jury, it is not error to refuse to submit additional issues or instructions which are mere shades or variations of the questions already submitted. Tex.R. Civ. P. 278; *Campbell v. C.D. Payne & Geldermann Securities, Inc.,* 894 S.W.2d 411, 425 (Tex.App.—Amarillo 1995, writ denied). That rule would also be applicable here. For each and all of the foregoing reasons, the trial court did not reversibly err in submitting jury questions 1 and 2. Appellants' fourth point is overruled.

In his fifth point, Carr argues the trial court erred "in submitting jury questions and instructions and entering judgment related to [Weiss's] fraud allegations." In addition to his evidentiary insufficiency objections, Carr's voiced objection to question 3 was that it "makes or misdefines the term 'misrepresentation' by including a false statement of present fact or the possibility of a statement of opinion that the maker knows to be false, because there are no pleadings to support such a submission and there is no evidence in this case to support such submission." Supporting that argument, he reasons that Weiss made fraud claims on three bases: 1) common law fraud; 2) statutory fraud under Tex. Bus. & Com.Code § 27.01, and 3) "though improperly pleaded, fraudulent concealment of a cause of action to toll the Statute of Limitations."

Citing *McCall v. Trucks of Tex., Inc.,* 535 S.W.2d 791, 794 (Tex.Civ.App.—Houston [1st Dist.] 1976, writ ref'd n.r.e.) he posits that under each theory, the essential elements of fraud are the same. They are, he reasons, 1) a misstatement of a past or existing material fact or of an opinion known by the speaker to be false or of a promise of future performance without present intent to perform that promise, 2) made to induce the other party into an action, 3) the other party acted upon the representation, and 4) because of that reliance, the other party suffered injury.

As we have stated, under Weiss's testimony and supporting evidence, if accepted by the jury, as it evidently was, the jury could have reasonably believed that a confidential relationship existed between the parties, that there was an agreement between the pair that property located by Weiss's efforts would be owned jointly between them, that in reliance upon that agreement Weiss acted and was instrumental in locating the Wellington, that at the time title to the Wellington was taken in Carr's name that he did not intend to share ownership, that by his conduct and representations, Carr concealed that intent from Weiss, and that by the failure to convey an interest in the Wellington to Weiss, he suffered injury. Weiss's pleadings were sufficient to present the issue and the

trial court did not err in submitting issue number 3. Carr's fifth point is overruled.

In his sixth point, Carr contends the trial court should not have submitted question 4 inquiring whether negligent misrepresentations were made by him. In addition to raising legal and factual evidentiary insufficiency objections, he objected that there was no definition of the term "negligent" and requested that the court instruct the jury that negligence "is the lack or want of ordinary care." Question 4 and its accompanying instruction is as follows:

Did Jim Carr make a negligent misrepresentation on which Larry Weiss justifiably relied?

"Negligent misrepresentation" occurs when:

a. a party makes a representation in the course of his business or in a transaction in which he has a pecuniary interest,

b. the representation supplies false information for the guidance of others in their business, and

c. the party making the representation did not exercise reasonable care or competence in obtaining or communicating the information.

Parenthetically, neither party raises the question of whether there might be a conflict between the jury's answer to question 3 and the answer to this one. Thus, that question is not before us.

In argument under his sixth point, and without citation of supporting authority, Carr posits that "negligence is a legal theory having a distinct meaning which may or may not be accurately understood by the jurors, or may contrast or differ from the jurors' usual use or understanding of the word." That being true, he concludes, the failure to submit his suggested instruction deprived the parties "of the opportunity to have the issues of liability decided within the limitations of applicable law." We disagree. This instruction, as submitted at the time of the submission of the case to the jury, was not subject to the objection made by Carr. The evidence relating to the history and development of the Carr–Weiss relationship and the acquisition of the Wellington was sufficient to justi-

fy the submission of the issue. Carr's sixth point is overruled.

In his seventh point, Carr argues that the trial court erred in submitting jury questions related to Weiss's constructive trust allegations and to Weiss's exemplary damage allegations. The gist of his challenge is that Weiss failed to plead and prove any breach of fiduciary duty on Carr's part, and because he failed to do so, neither the remedy of the imposition of a constructive trust nor the award of exemplary damages is available to him. Citing *Stephens v. Stephens,* 877 S.W.2d 801 (Tex.App.—Waco 1994, writ denied), Carr further submits that the question of the viability of a constructive trust as a remedy for the breach of a fiduciary duty cannot be properly submitted to a jury as this is a question of law. While it is true that the imposition of a constructive trust is an equitable matter within the discretion of the trial court, we do not find that the mere fact that the question was submitted to the jury was reversibly detrimental to Carr. For reasons we have previously stated, the record is sufficient to justify the submission of the question of the violation of a confidential relationship to the jury. Under the jury's affirmative answer to the question, the trial court did not abuse its discretion in imposing a constructive trust.

Carr's trial objection to the submission of jury question eight, the exemplary damage question, was that there is no evidence, or in the alternative, insufficient evidence to warrant the submission of the issue to the jury. He made no complaint about the form of the question nor as to the court's instruction that it be decided upon a preponderance of the evidence or as to the sufficiency of the evidence to support the amount of damages found by the jury. Thus, those questions are not presented in this appeal. In his brief, and without citation to relevant authority, Carr argues that exemplary damages are "methods of relief afforded when a breach of fiduciary duty is found" and, because in his view, the evidence was insufficient to show such a breach, submission of the issue was improper and prejudicial.

In our previous discussion, we have held that the court did not reversibly err in submitting jury question three inquiring whether Carr committed fraud against Weiss. The jury answered that question in the affirmative. Included in the question was an instruction that, in the case of a fiduciary or confidential relationship, fraud occurred if a party, knowing the other party is ignorant of a fact and does not have an equal opportunity to discover the truth of the fact, conceals or fails to disclose a material fact within the knowledge of that party and intends to induce the other party to take some action by concealing or failing to disclose the fact, and the other party, acting without knowledge of the undisclosed fact, suffers an injury. By its answer, the jury found that this type of deliberate fraud occurred. Intentional fraud committed for the purpose of injuring a plaintiff constitutes the type of conduct warranting an award of exemplary damages. For example, it is the rule that fraudulent misrepresentations used to induce the creation of a contract, coupled with damages caused by the misrepresentation, will support an award for exemplary damages. *See Schindler v. Austwell Farmers Co-op.*, 829 S.W.2d 283, 286–87 (Tex. App.—Corpus Christi 1992), *aff'd as modified*, 841 S.W.2d 853 (Tex.1992); *Artripe v. Hughes*, 857 S.W.2d 82, 87 (Tex.App.—Corpus Christi 1993, writ denied). The facts which gave rise to that type of holding are analogous to those before us and the rationale applied by the court is applicable here. Thus, under this record, we hold the trial court did not err in submitting the question of exemplary damages to the jury. Carr's seventh point is overruled.

In his eighth point, Carr contends there was no proof, insufficient proof, or only improper proof of Weiss's economic and mental anguish damages. This challenge is directed at jury questions 5 and 6. In question 5, the jury was asked to find the damages Weiss suffered because of the breach of fiduciary duty to him, namely:

a. for the reasonable market value, at this time, of the interest which Larry Weiss was entitled to receive in the Wellington Apartments project over and above the balance of the purchase money indebtedness on such property?

A. $450,000.

b. for lost profits which Larry Weiss should have received from his interest in the Wellington Apartments in the past?

A. $270,000.

c. for lost profits which Larry Weiss would reasonably have received in the future from his interest in the Wellington Apartments projects?

A. $500,000.

In question number 6, the jury was asked to determine the damages that should be awarded to Weiss for past mental pain and suffering "proximately caused by the fraud or breach of fiduciary duties of Jim Carr." To this question, the jury found damages of $25,000. In addition to his evidentiary insufficiency challenge to this question, Carr contends that Weiss failed to assert the type of claim upon which mental anguish damages can be awarded.

With regard to question 5, the economic damage issue, Carr's specific challenge is that no evidence of "the type usually relied on in valuing such property, such as sales of comparable properties or discounted valuations based on revenue or reports of certified appraisers was offered." Because the trial court did not render judgment on the jury findings in parts (a) and (c) of question 5, our discussion will be limited to the sufficiency of the evidence to sustain the jury finding as to the amount of Weiss's lost past profits. Responding to Carr's question 5 challenge, Weiss responds that "the management company paid all of the Wellington's operating expenses, including the mortgage principal and interest, and then disbursed the net income to Carr. By the time of trial, the management company sent more than $700,000 to Carr. Carr used a portion of those funds to make equity payments to himself, and he used the balance to subsidize his lifestyle."

In his testimony, Carr admitted that the management company had paid him a total of $707,496.57 over the five years "and a few months" since the purchase. That figure is also supported by an exhibit prepared by the management company which shows deposits

totaling that amount were paid from April 28, 1992, to July 1, 1997, a period of 62 months and two days. The deposits were made to J.T. Carr General Partner Account at Liberty Bank, to J.T. or Julie Carr accounts at "the Liberty Bank," "the Oklahoma Bank," and "the National Bank of Commerce" and to Associates' account at "the Capital." Carr qualified his admission of the total paid by saying that amount received by him was before payment of "the equity loans," namely the $250,000 down payment borrowed by him. He also admitted that the funds deposited in the J.T. Carr General Partnership Account involved a partnership between himself and Associates. Carr also testified that at the time of the trial, he still owed about $130,000 on the $250,000 he borrowed to make the down payment, and there was a balance of "right at" $700,000 owed on the original $750,000 purchase note. Carr also admitted, and an exhibit was received into evidence, that in March of 1995, he had an MAI appraisal valuing the Wellington at $1,815,000, which he had used in an unsuccessful attempt to obtain a new loan of $1,815,000 on the property. He admitted that if he had secured the loan, it would have paid off all indebtedness and, according to the MAI appraisal, there would have been $455,000 of equity in the Wellington. Under examination by his attorney, Carr also testified that if he had been willing to sell the Wellington, "the market value under the appraisal was a million-eight so I would have hoped to have gotten close to the million eight." When queried on recross-examination as to his opinion of the fair market value of the Wellington at the date of trial, his reply was, "I would just go with whatever the appraised value is, the appraisal said a million 815."

Under Carr's testimony that at the time of trial there was a balance of $130,000 due on the money he borrowed to make the down payment, and a $700,000 balance on the purchase money note, subtracted from the $1,815,000 he also said was the market value of the Wellington, the jury would have been justified in concluding there was a $985,000 equity in the apartments. Thus, for what it is worth, in view of the fact that the trial judgment made no specific award based upon

the jury's answer to subpart a of question 5, there is sufficient evidence in the record as to the reasonable market value of the Wellington.

In considering the jury's awards for lost past profits, we note that the ascertainment of lost profits and the sufficiency of the evidence to sustain such an award is sometimes difficult. However, in *Texas Instruments, Inc. v. Teletron Energy Mgt., Inc.*, 877 S.W.2d 276 (Tex.1994), the court quotes with approval the following instruction from the seminal case of *Southwest Battery Corp. v. Owen*, 131 Tex. 423, 115 S.W.2d 1097 (1938). It is as follows:

> The various legal encyclopedias and textbooks lay down certain rules applicable to an action for damages for loss of profits.... The generally accepted rule is that, where it is shown that a loss of profits is the natural and probable consequences of the act or omission complained of, and their amount is shown with sufficient certainty, there may be a recovery therefor; but anticipated profits cannot be recovered where they are dependent upon uncertain and changing conditions, such as market fluctuations, or the chances of business, or where there is no evidence from which they may be intelligently estimated. So evidence to establish profits must not be uncertain or speculative. It is not necessary that profits be susceptible of exact calculation, it is sufficient that there be data from which they may be ascertained with a reasonable degree of certainty and exactness.

877 S.W.2d at 279. After this quote, the *Teletron* court summarized the rule as:

> In order that a recovery may be had on account of loss of profits, the amount of the loss must be shown by competent evidence with reasonable certainty. Where the business is shown to have been already established and making a profit at the time when the contract was breached or the tort committed, such preexisting profit, together with other facts and circumstances, may indicate with reasonable certainty the amount of profits lost.

*Id.*

As we have noted, under the evidence, the management company had paid Carr a total

of $707,496.57 until July 1, 1997, shortly before the time of trial, which, Carr admitted as the amount receivable after all the operating expenses and costs. However, Carr testified, he had repaid $120,000 on the $250,000 he had borrowed to make the down payment. Subtracting that amount from the $707,-496.57 figure leaves a net figure of $587,-496.57, which the jury could reasonably have concluded was past profit from the operation of the Wellington. The figure of $270,000, which the jury found to be Weiss's share of the past profits is slightly less than one-half of $587,496.57. The evidence is sufficient to support that award.

In challenging the jury's award to Weiss of $25,000 for mental anguish, Carr contends the evidence is both legally and factually insufficient to sustain that award. In addition, without citation of relevant authority, he contends that Weiss failed to present the type of claim upon which mental damages can be awarded. Although for the reasons we have previously stated, the agreement between Weiss and Carr to acquire the Wellington was sufficient to give rise to a fiduciary relationship, in its essence, Weiss's cause of action arises from that agreement and, under the jury finding, the fraudulent failure to fulfill that agreement. It is the general rule that mental anguish damages are not recoverable in a cause of action for breach of contract or in a tort action arising from a contractual breach. *Hallmark v. Hand,* 885 S.W.2d 471, 481 (Tex.App.—El Paso 1994, writ denied). This action is of a nature sufficiently similar to those breach of contract actions as to make that rule applicable here. This is particularly true in view of the award of exemplary damages because of Carr's conduct. Accordingly, that portion of Carr's eighth point challenging the submission of jury question 6 is sustained. With that exception, his eighth point is overruled.

In his ninth point, Carr contends that the trial court erred in submitting question 9 concerning alter ego. His trial objection to the question was there was no reason to submit the question to the jury and, alternatively, there was no evidence or insufficient evidence to support the submission of the question. In argument here, Carr does not challenge the form of the question nor the instruction given in connection with it. However, again without the citation of relevant authority, he contends the question of alter ego "served no purpose in pleading or in the charge other than to confuse the real issue of liability and damage and to open the door to the court's admission of irrelevant, improper, and prejudicial character evidence." We disagree. The record shows that title to the property was taken in the name of Associates. In order to allow the imposition of a constructive trust, it was necessary to show Carr's ownership of the property. With regard to the question of sufficiency of the evidence, the record is replete with admissions by Carr that he was the managing general partner with authority to manage the property as he saw fit and that the net proceeds from the operation of the Wellington were deposited in various accounts controlled by him which we have discussed previously in considering the management company's report of its disbursement to him. Suffice it to say that we have examined the evidence in the case and find it supports the submission of the question as well as the jury's answer to it. Carr's ninth point is overruled.

In his tenth and eleventh points, he contends the evidence was both legally and factually insufficient to support the submission of questions 11 and 12. He also characterizes their submission as "an attempt to secure a finding of fraudulent concealment in order to toll the Statute of Limitations." The holding which we have previously made that the underlying suit was filed within the period allowable by the applicable statute of limitations makes it unnecessary to discuss this point.

In final summary, all of appellants' points are overruled, with the exception of that portion of its eighth point challenging the court's award of damages for mental anguish, which is sustained. The judgment of the trial court is modified to delete that part of the judgment which awards damages to Weiss for mental anguish. Tex.R.App. P. 43.2. As reformed, the judgment is affirmed.