In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-19-00356-CV

**TEXIENNE ONCOLOGY CENTERS, PLLC AND ASIT CHOKSI,**
**Appellants**

**V.**

**STEVEN CHON, Appellee**

**On Appeal from the 284th District Court**
**Montgomery County, Texas**
**Trial Cause No. 17-03-02955-CV**

## MEMORANDUM OPINION

Asit Choksi appeals from a trial court judgment rendered after a jury found that Dr. Asit Choksi fraudulently induced Dr. Steven Chon to sign a Binding Memorandum of Understanding with Greater Houston Physicians Medical Association, PLLC, now known as Texienne Oncology Centers, PLLC.[1]   In three

---

[1] While both Texienne Oncology Centers and Asit Choksi filed a notice of appeal, only Choksi filed a brief in this appeal or raised any appellate issues.

issues, Choksi argues the verdict is not supported by legally and factually sufficient evidence to demonstrate that Choksi intended to defraud Chon at the time the contract was signed by not fulfilling his contractual obligations, in finding that Choksi is liable in his individual capacity, and in awarding damages against Choksi in his individual capacity. For the reasons explained below, we affirm.

## Background

Greater Houston Physicians Medical Association, PLLC (GHPMA), now known as Texienne Oncology Centers, PLLC, had several locations throughout Montgomery and Northern Harris County.[2] GHPMA employed over 140 doctors at its numerous locations, including Dr. Chon. Dr. Choksi is the CEO of GHPMA.

## Chon's Testimony

Chon testified that he was employed by GHPMA from 2007 until 2016. In 2014, Choksi approached Chon about taking over a subcenter of another doctor with GHPMA. An addendum to his GHPMA employment agreement was executed. In the addendum, GHPMA agreed to pay Chon a higher salary and a discretionary bonus and included language absolving Chon of any debt the practice incurred prior to the time he took it over. This addendum became effective on January 1, 2015 and

---

[2] Greater Houston Physician Medical Association was known as Texienne Oncology Center and both parties refer to Texienne Oncology by the acronym, GHPMA, as such we will refer to Texienne Oncology as the same.

was to last one year. According to Chon, Choksi agreed to give him a bonus of 100 percent of the profits from his subcenter beginning in 2016.

In 2016, CHI Texas Health Network, LLC (CHI) entered negotiations to buy GHPMA. Chon testified that in early October 2016, he met with Choksi at a hotel in the Woodlands. Chon indicated he requested a meeting with Choksi to discuss "a couple of reimbursement checks" and wanted to get the checks signed. He testified that Choksi refused to release the reimbursement checks until Chon signed the CHI employment contract. When Chon refused to the sign the contract, Choksi became angry, and the meeting ended. After the meeting, Choksi sent Chon a text message, apologized, and told Chon that he is "under tremendous pressure to have physicians sign" employment contracts with CHI, and he wanted to meet with Chon to discuss his issues with the employment contract and give him his "checks." Chon then agreed to meet with Choksi again on October 17, 2016. At that meeting, Choksi confirmed that he wanted Chon to sign the employment contract with CHI, but Chon stated he would not sign the contract until his issues with GHPMA were resolved. Chon told Choksi he had not received any "profits or bonuses for the whole year of 2016, that I was owed money from the company." Ultimately, Chon reached a deal with Choksi for GHPMA to pay Chon $250,000 within two months of the signed contract. In this contract, Chon also agreed to release "all liabilities" related to his

3

employment with GHPMA. On October 17, 2016, both Choksi and Chon signed the contract ("October GHPMA Addendum"), which was admitted into evidence.

> THIS AGREEMENT is an Addendum to the employment agreement effective when closing and the funding from CHI St. Luke's Hospital transaction occurs, Steven Chon, MD, hereinafter called the "Employee" and Greater Houston Physicians Medical Association, PLLC, MD[,] a Texas Professional Limited Liability Company hereinafter called "Employer."
>
> . . .
>
> > 1. Within closing and funding of CHI St. Luke's Hospital transaction, GHPMA overage plus I-shares, including any other ownership in GHPMA or affiliated companies, Dr. Steven Chon will be paid $250,000.00 within two months.
> >
> > 2. Dr. Steven Chon agrees to release all liabilities related to the contract with GHPMA.

After signing the October GHPMA Addendum, Chon signed an employment contract with CHI. According to Chon, his employment with CHI would not begin until the GHPMA sale to CHI closed. Chon testified that after he signed the October GHPMA Addendum and the subsequent employment contract with CHI, GHPMA reached out to him to sign a "mutual termination agreement' a few days before the closing of the sale [of GHPMA to CHI]." The termination agreement noted that GHPMA and CHI had entered into a purchase agreement, and the employment contract between Chon and GHPMA would "terminate[] . . . effective as of the Closing [of the Contemplated Transaction]." Chon signed the termination agreement.

4

On November 10, 2016, the sale of GHPMA to CHI occurred, and Choksi's executive assistant contacted Chon to meet with him on November 17, 2016. Because the sale of GHPMA to CHI occurred the week before, Chon assumed the meeting would be for him to receive his check for $250,000. Chon stated that at the meeting, Choksi wanted him to sign a new contract. Chon understood this contract would replace the October GHPMA Addendum. The November contract was entitled "Binding Memorandum of Understanding" (MOU) between Choksi and Chon and provided:

> Within closing and funding of CHI St. Luke's Hospital transaction, for GHPMA, ENZO, Apollo overage, including account receivable up to November 10, 2016 and any bonuses known and unknown originating from Dr. Steven Chon work associated with GHPMA, ENZO, Apollo, any discretionary bonuses, and including any investments in GHPMA, ENZO, Apollo or affiliated companies, Dr. Chon will be paid $250,000.00 minus Tail Insurance of $14,266.00 minus PTO time up to November 10, 2016 over four months.

Chon discussed the MOU with his attorney, crossed out the language that stated, "minus Tail Insurance of $14,266.00 minus PTO time up to November 10, 2016[,]" and changed the time period for his payment of $250,000 to "2 (two) months." Both Chon and Choksi initialed the changes and signed the MOU. Chon released GHPMA from any claims when he signed the agreement. Chon testified that he signed the MOU because Choksi told him that although he could not immediately pay him $250,000, he could pay him $125,000 that night. Choksi gave him a check for $125,000, and Chon left the meeting.

5

Chon testified that after he signed the November MOU, he had two more discussions with Choksi about the remaining $125,000. In December 2016, Chon met with Choksi to receive the remaining $125,000. According to Chon, Choksi stated he could not pay him the full $125,000 and offered "to pay me half of that amount and gave me a new contract to sign." Chon refused to sign the contract. In January 2017, Chon then contacted Choksi to receive the remaining $125,000. At the meeting, Choksi presented Chon with another contract, offering him "$10,000 in January and the rest of the $115,000" after certain criteria have been met. Chon did not sign that contract, and in March 2017, filed the underlying lawsuit.

**Choksi's Testimony**

Choksi testified that from the Summer of 2016 until November 2016, his singular focus was the CHI transaction, and he did not have the 2016 numbers for Chon's subcenter. According to Choksi, he did not pay Chon the remaining $125,000 because after Chon's employment was terminated in November, Chon did not deliver the remaining "paperwork for charges and medical records . . . to GHPMA." Choksi agreed with the terms of the November MOU but stated that there were exceptions to that contract. Specifically, Choksi stated that although he agreed to pay Chon $250,000 within two months, it is "standard when you complete your employment contract you have to submit the charges and medical records, if needed, for payment from the insurance companies." Choksi stated that he did not know in

6

November 2016 Chon was withholding charges after his employment with GHPMA ended. According to Choksi, paragraph 1 in the November MOU provides that he will complete his work for GHPMA, but that was not a condition to payment.

Choksi testified that the October GHPMA Addendum and the November MOU signed by Chon were each "done based on [Chon's] charges and collections in 2015[,]" and if Chon was withholding charges, Choksi needed to know this before he signed those agreements. Choksi admitted: (1) the agreement did not say Chon's payment of $250,000 was contingent on Chon's "charges and collections" while employed at GHPMA; (2) the word "exception" does not appear in the November addendum; and (3) they did not discuss any exceptions when signing the contract. Choksi testified that he did not determine that Chon was withholding his billable charges until after he signed the November MOU with Chon. Choksi admitted that he could have asked for a report of Chon's profits and losses for his subcenter before his meeting with Chon to sign the contract, but he did not do so.

While Choksi maintained that Chon had to "do his work for GHPMA," it was not a condition outlined in the contract, and Choksi was "fully committed to paying the money." When asked if when he signed the contract, he intended to pay Chon, Choksi responded,

> At that time it was hundred percent yes. There was no if because I trusted Dr. Chon that he must have done the same work because he kept on saying he's doing very well, it's better than last year, so I trusted him for that, so there was not even a question in my mind that we paid.

7

At trial, regarding the partial payment of $125,000 to Chon in November, Choksi noted:

> Before paying the second 125,000, I had to go back and check on that, and that's why I gave him half the money so I can check up on the numbers. So as I started getting the information from Raymond and he said charges were not submitted, so I pushed Dr. Chon to give him everything. And he gave it after that in December and maybe early January, charges were submitted to Raymond, but still Apollo records were incomplete. So that's why the two other documents were asked for Dr. Chon to sign, which he refused to sign to give the medical records and to give the charges.

In an affidavit signed by Choksi, he stated the following about the November agreement:

> GHPMA agreed to the $250,000 amount in the Settlement Agreement estimating that Dr. Chon's collections from July 2016 to October 2016 would remain constant with his collections from January 2016 to June 2016, which did not differ significantly from his monthly average collections for 2015. If Dr. Chon had disclosed that his charges for the period from July 2016 to October 2016 had declined, GHPMA would have estimated that collections would also decline and would not have agreed to the payment of $250,000 in the Settlement Agreement.

Choksi also told the jury that Chon received his $250,000 in full because "[t]he 125[,000] was given, and then the other one is the sign-on bonus paid by CHI on behalf of GHPMA."[3]

---

[3] At trial, several other witnesses testified, but we limit our recitation of the facts to the issues raised on appeal.

**Jury Findings**

After the close of evidence, the jury found that GHPMA failed to comply with the November MOU and that Choksi fraudulently induced Chon to sign the MOU. The jury then assessed damages at $275,000 in favor of Chon, which the trial court reduced to $125,000 including pre- and post- judgment interest, after Choksi filed a post-trial motion contesting the damages and Chon agreed to the reduction. Choksi timely appealed.

**Standard of Review**

On appeal Choksi challenges the legal and factual sufficiency of the evidence to support the verdict and his individual liability for the judgment. When conducting a legal sufficiency review, we consider whether the evidence in the trial enabled reasonable and fair-minded jurors to reach the verdict that is being challenged in the appeal. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). Evidence cannot legally support a verdict if

> (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact.

*Id*. (citations omitted). More than a scintilla of evidence exists when reasonable and fair-minded jurors might reach different conclusions about the verdict based on the evidence admitted in the trial. *See id*.

9

In a factual-sufficiency review, the evidence supporting the jury's verdict will be found sufficient if the evidence the jury considered allows "reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). When reviewing a verdict, we must defer to the decisions the jury made about the weight the jury gave the evidence admitted in the trial. *Id.* In resolving disputed facts, the jury can observe the witnesses when they testify and choose to believe one witness's testimony over the testimony of others. *See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). The jury may decide an issue in the case by finding some witnesses more credible than others. *Id*.

That said, "'the jury's decisions regarding credibility must be reasonable.'" *City of Keller,* 168 S.W.3d at 820 (citation omitted). For instance, jurors are "not free to believe testimony that is conclusively negated by undisputed facts." *Id*. Even when evidence is undisputed, "it is the province of the jury to draw from it whatever inferences they wish, so long as more than one is possible and the jury must not simply guess." *Id*. at 820 (citations omitted).

**Issue One**

In his first issue, Choksi challenges the jury's finding that he fraudulently induced Chon to sign the November MOU. Choksi argues that the evidence is insufficient to show that at the time of its execution, he intended GHPMA not to comply with the MOU.

Fraud requires proof of: (1) a material misrepresentation; (2) that was false; (3) made by the speaker as a positive assertion, with knowledge that it was false or recklessly without any knowledge of the truth; (4) made by the speaker with the intent that the other party act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex.1998). *In Spoljaric v. Percival Tours, Inc.*, the Court explained:

> A promise to do an act in the future is actionable fraud when made with the intention, design and purpose of deceiving, and with no intention of performing the act. While a party's intent is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation is made. Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony.

708 S.W.2d 432, 434 (Tex.1986) (citations omitted). Although failure to perform, standing alone, is no evidence of the intent not to perform when the promise was made, that fact is a circumstance to be considered with other facts to establish intent. *Id*. at 435; *see also Morgan Bldgs. & Spas, Inc. v. Humane Soc'y of Se. Tex.*, 249 S.W.3d 480, 489 (Tex. App.—Beaumont 2008, no pet.). Since Choksi's appeal focuses solely on the intent element of fraud, we limit our analysis to that element.

Evidence at trial demonstrated that Chon did not want to sign a contract with CHI unless he received some form of compensation from GHPMA he believed he was owed under his employment contract with GHPMA. Chon testified that at the

11

October meeting, he refused to sign the CHI employment contract unless his issues with GHPMA were resolved. The evidence also established Choksi was under "tremendous pressure" to have the doctors employed with GHPMA sign on to work with CHI. As a result, Choksi agreed to pay Chon $250,000 to resolve his claim for compensation GHPMA owed. Chon subsequently signed the October GHPMA Addendum and the CHI employment contract on the same night. In November, after Chon's employment with GHPMA terminated, he again met with Choksi to retrieve what he believed to be the payment of $250,000 owed under the October GHPMA Addendum, as the sale of GHPMA to CHI had closed by that time. Instead, Choksi presented Chon with the MOU. The MOU contained releases between Chon and Choksi and stated that Chon would receive $250,000 divided into two payments after the "closing and funding of CHI St. Luke's Hospital transaction, for GHPMA, ENZO, Apollo overage, including account receivable up to November 10, 2016 . . . ." Chon testified that Choksi wanted him to sign the new agreement, and he only signed the MOU because Choksi agreed to pay him $125,000 that night.

Choksi testified that when he signed the November MOU with Chon, he fully intended to pay the $250,000, because he trusted Chon to be honest with his billings and profits at the subcenter he ran. Choksi agreed that the contract does not contain any provision making the payment conditional on Chon turning in his billings by a certain time. Choksi stated that although that language is not in the contract, it was

understood that would happen before Chon received the remaining $125,000. Choksi stated twice in the record that he only intended to pay Chon the remaining $125,000 if his collection numbers at his subcenter matched his 2015 numbers. At each subsequent meeting in December 2016 and January 2017, Choksi refused to pay Chon the remaining $125,000, and instead attempted to have Chon sign other contracts that would delay payment of the remaining $125,000 with the added conditions of Chon submitting his billings and medical records, and further releasing all claims against third parties. Additionally, Choksi's affidavit averred GHPMA would not have agreed to pay $250,000 if he had known about Chon's withheld billings.

Choksi's admission that he did not intend to pay the second payment of $125,000 until he reviewed Chon's subcenter billing records for 2016 and his subsequent actions attempting to have Chon sign a new agreement outlining this requirement is evidence which can reasonably be interpreted by the jury that he never intended to pay Chon the full amount when he executed the original agreement. *See Formosa Plastics*, 960 S.W.W2d at 52 ("when a party fraudulently procures a contract by making a promise without any intent of keeping the promise in order to induce another into executing the contract, a tort cause of action for that fraud exists."). While the Texas Supreme Court has cautioned that proving a defendant had no intention at the time of the contract to perform is "not easy," courts can rely

13

on breach of the contract, along with "'slight circumstantial evidence' of fraud[.]'" *Aquaplex, Inc. v. Rancho La Valencia, Inc.,* 297 S.W.3d 768, 774—75 (Tex. 2009) (citations omitted). This includes the parties' "'subsequent acts after the representation is made.'" *Id*. (citation omitted). Partial performance does not negate this intent, as there is evidence in this record outside of the partial payment of Choksi's intent not to perform and pay the remaining $125,000. *See Ginn v. NCI Building Sys., Inc*., 472 S.W.3d 802, 835 (Tex. App.—Houston 2015, no pet.) (citation omitted) ("evidence of partial performance will not preclude a finding of fraud if other evidence indicates an intent not to fully perform.").

Finally, Choksi's further testimony that Chon had received his final payment in the form of a signing bonus from CHI may also have reasonably been interpreted by the jury that Choksi had no intent to fully perform the contract when he executed it.

Considering the evidence before the jury, we conclude it contains legally and factually sufficient evidence to support the jury's findings that Choksi fraudulently induced Chon to sign the various agreements. To the extent Choksi complains the evidence fails to support jury question three, his argument is overruled.

**Issue Two**

In his second issue, Choksi argues that the evidence is insufficient "to support a finding of liability against Dr. Choksi in his individual capacity" in jury question three. Choksi argues that because he was an agent of GHPMA and received no personal benefit from the sale of GHPMA to CHI, he should not be individually liable.

In asserting that he received no personal benefit and therefore cannot be individually liable, Choksi directs this Court's attention to section 21.223 of the Texas Business Organizations Code stating that it shields him from individual liability. Section 21.223 provides,

> (a) A holder of shares, an owner of any beneficial interest in shares, or a subscriber for shares whose subscription has been accepted, or any affiliate of such a holder, owner, or subscriber or of the corporation, may not be held liable to the corporation or its obliges with respect to:
>
> > (1) the shares, other than the obligation to pay to the corporation the full amount of consideration, fixed in compliance with Sections 21.157-21.162, for which the shares were or are to be issued;
> >
> > (2) any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder, beneficial owner, subscriber, or affiliate is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory; or
> >
> > (3) any obligation of the corporation on the basis of the failure of the corporation to observe any corporate formality, including the failure to:

15

(A) comply with this code or the certificate of formation or bylaws of the corporation; or

(B) observe any requirement prescribed by this code or the certificate of formation or bylaws of the corporation for acts to be taken by the corporation or its directors or shareholders.

(b) Subsection (a)(2) does not prevent or limit the liability of a holder, beneficial owner, subscriber, or affiliate if the obligee demonstrates that the holder, beneficial owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate.

Tex. Bus. Orgs. Code Ann. § 21.223. Choksi argues that because the evidence is legally and factually insufficient to support any finding that he received a "personal benefit" from this transaction, he cannot be liable under section 21.223. *See id*.

The Fort Worth Court of Appeals addressed a similar argument and held that section 21.223 does not apply to common law fraud. *Spicer, Tr. for Estate of Brady v. Maxus Healthcare Partners, LLC*., 616 S.W.3d 59, 116-19 (Tex. App.—Fort Worth 2020, no pet.). In *Spicer*, the Court acknowledged a split in the courts regarding "whether Section 21.223 preempts an individual's direct tort liability in addition to his or her vicarious liability under a piercing-the-veil or related theory." *Id*. at 118*; but see TecLogistics, Inc. v. Dresser-Rand Grp., Inc.*, 527 S.W.3d 589, 599–600, 603 (Tex. App.—Houston [14th Dist.] 2017, no pet.). *Spicer*, following precedent from its Court, explained that although *TecLogistics* held that section 21.223 trumps any direct liability, the general rule in Texas "'has always been'" that

16

"'a 'corporation's employee is personally liable for tortious acts which he directs or participates in during his employment.'" *Spicer*, 616 S.W.3d at 118-19 (citing *Alexander v. Kent*, 480 S.W.3d 676, 697-98 (Tex. App.—Fort Worth 2015, no pet.)).

Similarly, a recent federal court held that "Texas has long had two methods for holding individual corporate agents or officers personally liable when they are acting within the course and scope of their employment or role as corporate agents – piercing the corporate veil or direct individual liability." *Bates Energy Oil & Gas v. Complete Oilfield Servs.*, 361 F. Supp. 3d 633, 664–72 (W.D. Tex. 2019). The Court explained that section 21.223 allows for an individual to pierce the corporate veil if they can demonstrate the individual committed actual fraud for a direct personal benefit, but "apart from any veil piercing theory seeking vicarious liability, it has long been established that "a corporation's employee is personally liable for tortious acts which he directs or participates in during his employment." *Id*. at 666 (quoting *Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 375 (Tex. 1984)). *Bates* noted that case law has "muddled this distinction" in analyzing section 21.223 and common law direct liability tort claims. *Id*. at 667. *Bates* cites *TecLogistics*, explaining it disagrees with its conclusion.

> The Court disagrees with *TecLogistics* that the common-law rule of direct personal liability for a corporate agent's own tortious conduct is superseded by § 21.223 when the tort claim is related to a contractual obligation of the corporation or LLC. The history of the statute and the statutory language indicate that it applies to veil piercing theories (for both contract and related tort claims), but not to direct liability claims

17

for an individual's own tortious conduct. The protection of subsection (a)(2) applies to "any contractual obligation of the corporation or any matter relating to or arising from the obligation[,]" indicating that it applies to claims holding a shareholder or owner liable for a contract-related corporate obligation (both contract and tort), the classic veil piercing scenario. Further, it bars claims seeking to hold a shareholder or owner liable for a corporate obligation on the basis that the individual "is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory." As used here, alter ego, actual and constructive fraud, and sham to perpetrate a fraud are veil piercing theories under Texas common law.

*Id*. at 672-73 (citations omitted)

We agree with *Bates* and *Spicer* and hold that section 21.223 does not preclude direct liability for a corporate employee's tortious actions. *Spicer* reasoned that in its case, the plaintiff had sued the defendant for direct liability for fraudulent acts, and as such, declined to apply 21.223. *See* 616 S.W.3d at 119. We are faced with the same scenario in this case. In his first amended petition, Chon sued Choksi for fraud and asked that he be held "personally liable because a corporate officer who knowingly participates in tortious or fraudulent acts may be held individually liable to third persons even though he performed the act as an agent of the corporation." Accordingly, Chon was not requesting to pierce the corporate veil under section 21.223 but to hold Choksi directly liable for his tortious acts. We overrule his second issue.

18

## Issue Three

In his final issue, Choksi argues that the evidence is legally and factually insufficient to support damages against Dr. Choksi in his individual capacity in jury question four. Choksi contends that the charge contains a broad form jury question that did not segregate the claims between breach of contract and fraud, thus it is impossible to determine if the jury found GHPMA or Choksi individually liable.

The jury charge had the following language regarding damages:

QUESTION 1

Did GHPMA fail to comply with the Memorandum of Understanding?

Answer "Yes" or "No."

Answer: YES

. . .

QUESTION 3

Did Dr. Choksi fraudulently induce Dr. Chon to sign the Memorandum of Understanding?

Fraud occurs when:
1. A party makes a material misrepresentation, and
2. The misrepresentation was made with knowledge of its falsity or made recklessly without any knowledge of the truth as a positive assertion, and
3. The misrepresentation is made with the intention that it should be acted on by the other party, and
4. The other party relies on the misrepresentation and thereby suffers injury.

19

"Misrepresentation" means a promise of future performance made with an intent, at the time the promise was made, not to perform as promised.

When an agent signs a contract on behalf of a corporation, the agent's signature is a representation by the agent that the corporation intends to perform the contract at the time the agent signs.

Answer "Yes" or "No."

Answer: YES

. . .

QUESTION 4:

What sum of money, if paid now in cash, would fairly and reasonably compensate Dr. Chon for his damages, if any, that resulted from the conduct found by you in Question 1 and/or Question 3?

Consider the following element of damages, if any, and none other. Do not include interest on any amount of damages you find.

Answer in dollars and cents for damages, if any.

The amount of money, if any, GHPMA agreed to pay Dr. Chon under the Memorandum of Understanding, less any payments Dr. Chon has already received from GHPMA under the Memorandum of Understanding.
Answer: $ 275,000

The judgment of the trial court found the following regarding damages.

**<u>Judgment for Dr. Chon Against Dr. Choksi for Fraud</u>**

The Court enters JUDGMENT in favor of Dr. Steven Chon and against Asit Choksi, M.D., Individually, in the amount of $125,000.00 in actual damages for the fraud Dr. Choksi perpetrated on Dr. Chon.

The Court finds that Dr. Chon is entitled to pre-judgment interest on actual damages at the statutory rate of 5.5% per year, accruing from the date this lawsuit was filed on March 6, 2017 until the day before this judgment is signed. TEX. FIN. CODE §§ 304.003, 304.103.

It is ORDERED that Dr. Steven Chon have judgment against Dr. Asit Choksi, Individually, for:

1. Actual damages for fraud in the amount of $125,000.00,
2. Pre-judgment interest on actual damages in the amount of $21,886.99 resulting in a total of $146,886.99, together with
3. All costs of Court, and
4. Post-judgment interest on all the above at the rate of 5.5% per year, compounded annually, from the date this judgment is signed until the day it is fully satisfied. TEX. FIN. CODE § 304.003.

It is further ORDERED that Texienne take nothing on all its counterclaims against Dr. Chon and that no party is awarded attorneys' fees.

It is ORDERED that execution for this judgment shall issue promptly.

After trial, but before the trial court signed the judgment, Choksi filed a Motion to Disregard Jury Findings, asking the trial court to disregard the jury's answers to question three for insufficient evidence and question four as it was an incorrect broad form question, and to reduce the damages award to no more than $125,000. Chon responded that the evidence was sufficient for question three, that

Choksi's arguments to question four are waived, but conceded that the jury's award of damages should be reduced to $125,000 based on the evidence presented.

Additionally, in a motion for new trial, Choksi argued that the award did not delineate the damages liability under question four of the jury charge, and "it is impossible to determine what amounts if any are attributable to Defendant [GHPMA]'s breach of contract and what amounts, if any, are attributable to Defendant Dr. Choksi's fraud." The motion for new trial was overruled by operation of law.

"The trial court has broad discretion in submitting jury questions so long as the questions submitted fairly place the disputed issues before the jury." *McIntyre v. Comm'n for Lawyer Discipline*, 247 S.W.3d 434, 443 (Tex. App.—Dallas 2008, pet. denied) (citations omitted). A trial court is required to submit controlling questions to the jury if the issue is properly raised by the written pleadings and evidence. *See* Tex. R. Civ. P. 278; *see also Triplex Commc'ns, Inc. v. Riley*, 900 S.W.2d 716, 718 (Tex. 1995). A trial court has more discretion when submitting instructions to the jury questions than when submitting questions as part of the jury charge. *McIntyre*, 247 S.W.3d at 443.

Texas Rule of Civil Procedure 274 addresses objections and requests related to the jury charge. It provides as follows:

> A party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection. Any complaint as to a question,

definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections. When the complaining party's objection, or requested question, definition, or instruction is, in the opinion of the appellate court, obscured or concealed by voluminous unfounded objections, minute differentiations or numerous unnecessary requests, such objection or request shall be untenable. No objection to one part of the charge may be adopted and applied to any other part of the charge by reference only.

Tex. R. Civ. P. 274.

To preserve error, the complaining party must specifically object, clearly identify the error, and explain the grounds for the objection. *See In re B.L.D.*, 113 S.W.3d 340, 349 (Tex. 2003). The primary purpose served by objections to a court charge is to apprise the trial court of error, thus affording the court the opportunity to correct the error. *See Wilgus v. Bond*, 730 S.W.2d 670, 672 (Tex. 1987); *Carr v. Weiss*, 984 S.W.2d 753, 766 (Tex. App.—Amarillo 1999, pet. denied). Where a party's objections are too general and too profuse it cannot be said that the trial court was fully cognizant of the grounds of the objection and deliberately chose to overrule it. *See Monsanto Co. v. Milam*, 494 S.W.2d 534, 536–37 (Tex. 1973). Thus, where a party's objection is obscured or concealed among voluminous, general, unfounded objections, it will not preserve error. *See* Tex. R. Civ. P. 274.

Choksi did not submit a proposed jury charge for question four and did not object to the question during the charge conference before the charge was read to the jury. With respect to Choksi's complaint about jury question three for the reasons discussed above in the fraud analysis, we determine the evidence was sufficient to

warrant its submission. Tendering a proposed jury question or instruction will not suffice to preserve error when a proper objection has not been made to the question or instruction submitted. *See Kirkpatrick v. Mem'l Hosp. of Garland*, 862 S.W.2d 762, 769 (Tex. App—Dallas 1993, writ denied); *see also Carr*, 984 S.W.2d at 766 "A request for submission is required to preserve the right to complain of a trial court's failure to *submit* a question; whereas, an objection is required to preserve a complaint as to a *defective* question." *Hartnett v. Hampton Inns, Inc.*, 870 S.W.2d 162, 166 (Tex. App.—San Antonio 1993, writ denied) (citing Tex. R. Civ. P. 274, 278). Appellants did not specifically object to jury question four on the basis that it contained broad form language and failed to delineate liability between GHPMA or Choksi, nor did they explain to the trial court why or how the language rendered the question defective. *See* Tex. R. Civ. P. 274. We conclude that Choksi failed to preserve his objection to preserve the errors asserted in issue three. *See id.* We overrule this issue.

## Conclusion

Having overruled all Choksi's issues, we affirm the judgment of the trial court.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on February 1, 2021
Opinion Delivered October 28, 2021

Before Golemon, C.J., Kreger and Horton, JJ.

24